Lynn C. LOWE, M.D., et al.,
Plaintiffs, Appellants,

v.

H. Denman SCOTT, M.D., et al.,
Defendants, Appellees.

No. 91–1592.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1992.

Decided March 18, 1992.

Lynette Labinger with whom Roney & Labinger, Providence, R.I., was on brief, for plaintiffs, appellants.

Marc DeSisto with whom Carroll, Kelly & Murphy, Providence, R.I., was on brief, for Milton W. Hamolsky, M.D.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

Dr. Lynn C. Lowe ("Dr. Lowe")[1] is an obstetrician-gynecologist licensed to prac-

---

1. Dr. Lowe is a licensed obstetrician-gynecologist in Rhode Island who practices medicine through a professional services corporation— Lynn Clarke Lowe, M.D. Associates, Ltd. Both

tice medicine in Rhode Island who holds staff privileges at Women & Infants' Hospital ("WIH"), a private hospital located in Providence, Rhode Island. On November 15, 1989, WIH suspended Dr. Lowe's privilege to supervise nurse midwives at the delivery stage. The following month, in December 1989, Dr. Lowe brought an action in the District Court for the District of Rhode Island pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief against officials of Rhode Island's Board of Medical Licensure and Discipline. Dr. Lowe alleged that these officials deprived him without due process of his constitutionally-protected property interests in his license to practice medicine and hospital privilege to supervise nurse midwives at WIH.[2] Named as defendants in their official capacity were H. Denman Scott, M.D., the Chairman of Rhode Island's Board of Medical Licensure and Discipline, and Milton W. Hamolsky, M.D., the Board's Chief Administrative Officer. Dr. Hamolsky was also sued under § 1983 for damages in his individual capacity. In addition, Dr. Lowe's complaint alleged a claim of tortious interference with advantageous and/or contractual relations under Rhode Island law.

By the time of trial in April 1991, WIH had reinstated Dr. Lowe's privilege to supervise nurse midwives, thereby rendering the claims for injunctive and declarative relief moot. The case proceeded to a jury verdict on the issue of damages under § 1983 against Dr. Hamolsky in his individual capacity. The jury returned a verdict in Dr. Lowe's favor for $175,000 on the due process claim of deprivation of Dr. Lowe's privilege to supervise nurse midwives, but rejected his state tort claim.

After entry of the verdict on Dr. Lowe's due process claim, the district court granted a motion for directed verdict by Dr. Hamolsky made at the close of Dr. Lowe's

evidence and renewed at the conclusion of Dr. Hamolsky's defense. The district court ruled that the evidence was insufficient to establish that Dr. Lowe had a constitutionally-protected property interest in his hospital privilege to supervise nurse midwives at WIH. The district court also granted Dr. Hamolsky's motion for a conditional new trial in the event of reversal on appeal by this court of the directed verdict in Dr. Hamolsky's favor.

Dr. Lowe appeals both the district court's grant of a directed verdict on his constitutional claim and the grant of a conditional new trial. No appeal has been taken by Dr. Lowe from the jury verdict rejecting his tort claim. We affirm the district court's grant of a directed verdict, although on different grounds than those relied on by the district court.

## I. FACTS

Because of the complexity of the factual predicate to Dr. Lowe's due process claims and the procedural posture of this case on appeal, it is necessary to review in detail the trial testimony and evidence. We present the testimony by subject matter.

A. *The Consent Order Restricting Dr. Lowe's License and the Restriction of His Hospital Privileges at WIH.*

Dr. Lowe testified that a substantial portion of his private practice in obstetrics and gynecology was handled by two certified nurse midwives ("CNMs"). These nurse midwives were qualified to perform routine obstetrical and gynecological procedures, including hospital deliveries. The two CNMs associated with Dr. Lowe played a significant role in his overall practice because many patients preferred to be attended by a midwife rather than a physician throughout their pregnancies. During deliveries performed by the CNMs at WIH, Dr. Lowe had the responsibility to be

---

Dr. Lowe and his professional corporation are plaintiffs in this action. For purposes of convenience both plaintiffs will be referred to collectively as "Dr. Lowe" throughout the opinion.

**2.** The due process claims were brought under both the United States and Rhode Island Constitutions.

present at the hospital, so as to be available for consultation in the event of problems or to take over if the need arose for operative delivery by forceps or caesarian section.

Dr. Lowe's authority to supervise CNMs was only a part of his overall hospital privileges as an obstetrician-gynecologist to admit patients and perform certain kinds of surgery at WIH. At WIH, the grant or revocation of such privileges depended on the recommendation of a supervising "Medical Staff Executive Committee" and the vote of the hospital's Board of Trustees. CNMs who performed deliveries at WIH were required to comply with applicable hospital procedures, which included the requirement that a supervising physician with appropriate privileges be present at the hospital throughout the delivery. Dr. Lowe's authority to supervise CNMs during deliveries at WIH was thus an important feature of his practice.

In April of 1987, the Board of Medical Licensure and Discipline of Rhode Island's Department of Health ("the Board") began an investigation of Dr. Lowe because of concerns about certain aspects of his past performance. Under Rhode Island law, the Board has the authority, subject to statutorily-mandated procedural requirements, to revoke or restrict medical licenses. *See* R.I.Gen.Laws §§ 5-37-5.1 to -9.1 (1991). The investigation of Dr. Lowe was carried out by a four-person subcommittee of the Board, Investigating Committee I. At that time the Board's chair was the defendant Dr. H. Denman Scott, who was also the director of Rhode Island's Department of Health. Dr. Frances P. Conklin, also a member of the Board, served as the chair of Investigating Committee I during its review of Dr. Lowe's cases.

Dr. Milton W. Hamolsky also assisted in the investigation of Dr. Lowe. Dr. Hamolsky was the Board's Chief Administrative Officer, and as such was responsible for the day-to-day conduct of the Board's activities concerning physician licensing and discipline. He was not, however, a member of the Board itself. As Chief Administrative Officer, Dr. Hamolsky assisted the Board's Investigating Committees in preliminary inquiries into complaints of physician misconduct and transmitted the results of these inquiries to the full Board for its consideration. In the event of a finding of physician misconduct by the Board, Dr. Hamolsky had the responsibility to notify all Rhode Island hospitals and the general public of the Board's disciplinary action.

At the same time that the Board began its investigation of Dr. Lowe, WIH began its own review of Dr. Lowe's cases in order to determine if a modification of his hospital privileges might be necessary. In September 1987, following investigation of Dr. Lowe's treatment of one patient in particular, Dr. Hamolsky contacted Dr. Lowe on behalf of the Board to inform him that his license to practice medicine had been suspended pending a hearing. Because of the interim suspension of Dr. Lowe's license, WIH simultaneously revoked his hospital privileges.

Following the Board's suspension of his license to practice medicine, Dr. Lowe negotiated a draft "Consent Order" with Investigating Committee I which was intended to permit him, although subject to certain restrictions, to resume the practice of medicine. The principal architects of the draft Consent Order were counsel for Dr. Lowe and the Board. Dr. Hamolsky also participated in these negotiations as the representative of Investigating Committee I. Dr. Lowe agreed to be bound by the terms of the proposed Consent Order upon its approval by the full Board. On February 2, 1988, the Board adopted the Consent Order.

The Consent Order identified three "areas of concern" noted by Investigating Committee I that were to be remedied by restrictions on Dr. Lowe's license over the following three years: (1) due to the size of his practice, Dr. Lowe had risked giving insufficient attention to complex problems and had also risked missing clinical complications at an early stage when their remedy would have been relatively simple; (2) Dr. Lowe "overly relied on nurse mid-wives to manage complex obstetrical cases;" and (3) Dr. Lowe had, at times, failed to consult

with experienced colleagues as complications arose. In order to address these concerns, the Consent Order required, *inter alia,* the formation of a "pool" of physicians at WIH to supervise Dr. Lowe. Dr. Lowe agreed that he would not perform surgery without having a pool physician in attendance.

Section 12 of the Consent Order specifically addressed Dr. Lowe's use of nurse midwives: "Respondent and his staff shall strictly adhere to the WIH protocols for use of certified nurse-midwives."[3] Both Dr. Hamolsky and Dr. Conklin testified that section 12 of the Consent Order was intended to address the finding of Investigating Committee I that Dr. Lowe "overly relied on nurse mid-wives to manage complicated obstetrical cases." Dr. Conklin stated that it was the position of Investigating Committee I that Dr. Lowe should not be allowed to supervise nurse midwives and that this position was clearly communicated to Dr. Hamolsky during the drafting of the Consent Order. Dr. Hamolsky testified that he, along with the members of Investigating Committee I, believed that the Consent Order would prevent Dr. Lowe from supervising nurse midwives for the three-year duration of the Order.

By agreeing to the Consent Order, Dr. Lowe expressly waived, *inter alia,* his right to a full hearing before the Board and any rights to appeal. The Order nonetheless specified certain procedures through which the restrictions on Dr. Lowe's license could be modified. The Order provided that the physician pool would report to Investigating Committee I on Dr. Lowe's performance and could recommend any changes in the level of supervision that it deemed necessary. Upon receiving such a recommendation, Investigating Committee I would meet with Dr. Lowe to determine whether any modification of the Order was appropriate, including "a continuation of the current level of restrictions, [or] an increase, decrease or change thereof...."

In the event of disagreement between Investigating Committee I and Dr. Lowe, all disputes were to be resolved by the Board's Hearing Committee. The Hearing Committee possessed the authority to rule on behalf of the Board. At that time, the Hearing Committee comprised approximately one-half to two-thirds of the membership of the full Board. The Consent Order expressly provided that "the Hearing Committee shall not be bound to follow the recommendations of the physician pool" and that "the restrictions contained in the order shall remain in full force and effect unless modified by subsequent order of the Board...."

Although WIH cooperated with the Board in the formulation of the Consent Order restricting Dr. Lowe's license to practice medicine in Rhode Island, it also adopted its own restrictions limiting Dr. Lowe's privileges at WIH itself. In February 1988, at the same time as the Board's adoption of the Consent Order, the Medical Staff Executive Committee of WIH formulated a "Resolution" restricting Dr. Lowe's privileges for a period of thirteen months. This Resolution was approved by WIH's Board of Trustees.

Besides specifying additional guidelines applicable to the physician pool supervising Dr. Lowe during surgery, WIH's Resolution expressly revoked Dr. Lowe's privilege to supervise nurse midwives. Dr. Lowe asked WIH for a hearing on the revocation of his privilege to supervise nurse midwives because he believed that in this respect (and in others) WIH's Resolution exceeded the restrictions contained in the Consent Order. Despite Dr. Lowe's objec-

---

**3.** Section 12 of the Consent Order also restricted the conduct of nurse midwives in relation to Dr. Lowe:

The CNM may assume responsibility for the management of the medically uncomplicated patient, as long as progress remains normal. In the course of patient management, the CNM will report any deviation from the normal status to the physician who has ultimate responsibility for patient care. In cases followed by the CNM, the CNM will be in frequent contact with Respondent [Dr. Lowe] (when Respondent is the responsible physician) and such contact and Respondent's instructions will be fully documented in the patient's record by both the CNM and by the respondent.

tions, the Resolution was not modified by WIH's Board of Trustees.

B. *WIH's Restoration of Dr. Lowe's Full Privileges*

During the ensuing thirteen months, Dr. Lowe was supervised during major surgery by the physician pool. The physician pool issued periodic reports that reviewed Dr. Lowe's performance favorably. The nurse midwives associated with Dr. Lowe's practice were supervised by other obstetrician-gynecologists at WIH during their deliveries. On March 16, 1989, the physician pool notified both the Board and WIH's Executive Committee that "in view of [Dr. Lowe's] satisfactory compliance with the recommendations of the Executive Committee, it is the recommendation of this Panel Physicians Committee that all of his privileges be restored completely, to include supervision of midwives." The physician pool further recommended that the Board rescind those provisions of the Consent Order that forbade Dr. Lowe from performing surgery without the supervision of a pool physician.

On April 27, 1989, WIH wrote Dr. Lowe and the Board to inform them that its Board of Trustees had voted to restore Lowe's full privileges. In its letter to Dr. Lowe, WIH stated that "it is also the position of the Hospital that you may now supervise midwives so long as you and they are in compliance with applicable hospital protocols." In its companion letter to the Board, WIH indicated that it understood that notwithstanding the restoration of Dr. Lowe's full privileges,

> Dr. Lowe's practice in the Hospital still may be restricted by provisions of the Consent Order (as restrictions on his license to practice medicine in Rhode Island). Since the Hospital is not a party to the Consent Order, we would appreciate your advising us ... as to whether the Consent Order will remain in effect, be modified in whole or in part or be terminated.

WIH also requested clarification from the Board as to whether the pool physicians had any further responsibility under the Consent Order to supervise Dr. Lowe.

After receiving the letter from WIH's Trustees, Dr. Lowe resumed in-hospital supervision of the nurse midwives in his practice. Dr. Lowe testified that he thought that the restoration of his full privileges at WIH permitted him to resume supervision of nurse midwives because section 12 of the Board's Consent Order provided only that he should "strictly adhere to the Women & Infants' protocols for use of certified nurses...."

Dr. Conklin testified that she and the other members of Investigating Committee I became aware that Dr. Lowe had resumed the supervision of nurse midwives soon after WIH's restoration of his full hospital privileges. Between April and June of 1989, Investigating Subcommittee I met on several occasions to discuss the recommendation by the physician pool that the Consent Order's requirement of supervision of Dr. Lowe during surgery be rescinded. During the course of these meetings, Dr. Hamolsky and the members of Investigating Committee I also discussed whether the Consent Order prevented Dr. Lowe from resuming the supervision of nurse midwives. Both Dr. Conklin and Dr. Hamolsky testified that they continued to believe that the Consent Order precluded Dr. Lowe from supervising nurse midwives, although they were aware of the absence of exact language to that in effect in the Order itself.

On June 14, 1989, Investigating Committee I formally recommended the deletion from the Consent Order of the physician pool supervision requirement. The following month, counsel to Investigating Subcommittee I and the Board, Alan Gelfuso, wrote Dr. Lowe and his attorney to inform them of that result. In that letter, Gelfuso also made the following statement:

> All other matters set forth in the consent decree remain in full force and effect including, without limiting, the generality thereof:
>
> . . . .
>
> 3. Dr. Lowe is not to supervise nurse midwives in the hospital pending further action of the Board.

Dr. Lowe testified that he believed this statement by Gelfuso on behalf of Investigating Subcommittee I on the issue of the supervision of nurse midwives was "a total mistake." Dr. Lowe viewed this interpretation as a substantive modification of the terms of the Consent Order, and testified that he understood that such a change could not be made without a formal determination through the procedures specified in the Consent Order. Invoking these procedures, Dr. Lowe and his attorney asked to appear before the Hearing Committee so as to challenge what Dr. Lowe believed was an unauthorized modification by Investigating Committee I of the restrictions on his license.

On October 10, 1989, the Hearing Committee declined to modify the Consent Order in any way. This refusal to change the Consent Order had two effects. First, the Hearing Committee's decision precluded any change in the physician pool supervision requirement. In this respect, the Hearing Committee's action overrode the recommendations of both the WIH physician pool and Investigating Committee I that the physician pool supervision requirement be removed from the Order. Second, although this is not clear from the testimony presented at trial, it appears that the Hearing Committee's decision not to adopt any change in the Consent Order left unresolved the issue of whether the Consent Order, by itself, prohibited Dr. Lowe from supervising nurse midwives. According to Dr. Hamolsky, he later became aware that the issue of Dr. Lowe's supervision of nurse midwives was never raised at the Hearing Committee's meeting.

Dr. Lowe testified that he believed that the Consent Order as written permitted him to supervise nurse midwives. Dr. Lowe drew a distinction between the statements on the midwife issue made by Gelfuso on behalf of Investigating Subcommittee I, which he believed were inaccurate, and what he believed the Consent Order expressly provided. After the Hearing Committee's refusal to modify the Consent Order, Dr. Lowe continued to believe that it was the unchanged position of the Board that he could supervise nurse midwives.

Dr. Hamolsky, however, continued to share the view of Investigating Subcommittee I and its counsel that the Consent Order prohibited Dr. Lowe from supervising nurse midwives. Dr. Hamolsky testified that at the time of the Hearing Committee's October 1989 decision he was unaware that the Hearing Committee had not actually considered the midwife issue. According to Dr. Hamolsky, at that time he interpreted the refusal of the Hearing Committee to modify the Consent Order as an endorsement of his interpretation—and that of Investigating Committee I and its counsel Gelfuso—that Dr. Lowe was prohibited from supervising nurse midwives. Dr. Hamolsky further testified that after the Hearing Committee vote he decided that "the time had come to attempt to resolve the continuing difference of judgment between the physician, his legal counsel and the actions of the hospital and the continuing concerns and judgments of my investigative committee." At the same time, Dr. Hamolsky also recognized that the precise wording of section 12 "negated our judgment that the Consent Order precluded his supervision [of midwives]."

C. *Dr. Hamolsky's Communications with WIH*

In order to "clarify" the situation, on November 1, 1989, Dr. Hamolsky wrote to the President and Executive Vice–President of WIH the following letter, which provides in pertinent part:

> In accordance with ... the Consent Order between the Board and Dr. Lowe, Investigating Committee I has considered the request by Dr. Lowe and counsel for the reduction in the level of supervision for Dr. Lowe.
>
> Following a meeting with Dr. Lowe and counsel, consideration of the recommendations of the Panel Physicians Committee ..., [the decision by WIH's Trustees to restore Dr. Lowe's privileges], polling of the individual members of the Panel Physicians Committee, and relevant interviews, the investigating committee voted to delete the requirement of supervision by the Senior Physician Panel.

The Board's legal counsel notified Dr. Lowe's counsel by letter of 12 July 1989 of said modification of the Consent Order, adding that:

All other matters set forth in the Consent Decree remain in full force and effect, including, without limiting, the generality thereof:

. . . .

3. Dr. Lowe is not to supervise nurse midwives in the hospital pending further action of the Board.

Dr. Lowe, by his attorneys, moved that the Hearing Committee "schedule a hearing ... to resolve the dispute between the respondent and Investigating Committee I concerning the level of restrictions thereunder."

On 10 October 1989 the Hearing Committee of the Board deliberated upon the documents and testimony presented and voted unanimously to deny the appeal of the Respondent from the decision of the Investigating Committee I.

The present status of this matter, therefore, is that the original Consent Order remains in full force and effect.

Dr. Hamolsky signed the letter in his capacity as Chief Administrative Officer of the Board and sent copies to other senior officers at WIH and the Chairman of its Medical Staff Executive Committee.

Dr. Conklin testified that she and the other members of Investigating Committee I "authorized"—and fully agreed with—Dr. Hamolsky's letter, insofar as it presented their interpretation of the Consent Order that Dr. Lowe was not to supervise nurse midwives. Dr. Conklin, however, did not see Dr. Hamolsky's letter before it was sent, and the members of Investigating Committee I did not formally approve Dr. Hamolsky's action by vote at one of their regular meetings.

Several days later, on or around November 6, 1989, Dr. Lowe became aware that officials from WIH had received Dr. Hamolsky's letter. After learning of the contents of the letter, Dr. Lowe requested a meeting with Dr. Hamolsky. On November 7, 1989, Dr. Lowe and his attorney met with Dr. Hamolsky and Gelfuso, counsel to Investigating Committee I and the Board. Dr. Lowe testified that at this meeting both sides presented their conflicting views on the issue of whether the Consent Order prohibited Dr. Lowe from supervising nurse midwives. Dr. Lowe told Dr. Hamolsky that any interruption in his ability to supervise nurse midwives would be extremely damaging to his practice and would probably cause his nurse midwives to leave the practice. Both sides agreed that the best way to resolve the conflict was to send a letter to Investigating Committee I recommending a review of all the deliveries performed by midwives under Dr. Lowe's supervision.

On November 9, 1989, Gelfuso again wrote Dr. Lowe's attorney summarizing his opinion that Lowe was not entitled to supervise nurse midwives under the terms of the original Consent Order. Gelfuso's letter further noted that for Dr. Lowe to take any action in reliance on the recommendations of the physician pool at WIH would be "clearly at his own risk and more especially in the future, based on the notice which we have given you, as of November 7, 1989, [ ] at his peril." Gelfuso also noted that the matter would be discussed at a meeting of Investigating Committee I scheduled for November 16, 1989.

Meanwhile, administrative officials at WIH received copies of Dr. Hamolsky's November 1st letter. Mary Struck, WIH's senior vice president for patient care, contacted Leland Clabots, WIH's executive vice president and chief operating officer, in an attempt to clarify whether Dr. Lowe could supervise nurse midwives. On November 15, 1989, a patient of Dr. Lowe's was admitted to WIH for delivery by one of the nurse midwives from his practice. Dr. Lowe was on call to supervise that delivery. Leland Clabots testified that after receiving calls from Mary Struck and Deborah Guard, the hospital's risk manager, he decided to give Dr. Hamolsky an "emergency" call in order to clarify the status of Dr. Lowe's license.

Clabots testified that he asked Dr. Hamolsky about the status of Dr. Lowe's license and "if it was the opinion of the

Board ... that he could not supervise midwives." According to Clabots, Dr. Hamolsky responded that *"it was the position of the Board that Dr. Lowe could not supervise nurse midwives."* Dr. Hamolsky testified that he recalled a different conversation. He remembered receiving Clabots' call and testified that he told Clabots that while the matter was one ordinarily handled by legal counsel, he thought it necessary to respond because it was an urgent situation in which a patient was involved. Dr. Hamolsky testified that he merely repeated to Clabots the contents of his letter of November 1st to the effect that a disagreement existed between Investigating Committee I and Dr. Lowe and that the October 1989 judgment of the Hearing Committee had "returned us to the Consent Order."

After this phone conversation, Clabots contacted Mary Struck and Deborah Guard and informed them that Dr. Lowe was not to supervise the midwife then currently attending the delivery in progress, nor any future deliveries by midwives. Clabots told them that another physician would have to be found to supervise the midwife during delivery. Clabots testified that he took these actions because he understood Dr. Hamolsky to have told him that "based upon the Board's actions, [ ] Dr. Lowe was not able to supervise nurse midwives," and because of the risk to WIH that would arise in the event of a malpractice suit if it appeared that the hospital had not complied with the direction of the state agency licensing physicians.

After Clabots' telephone call to Dr. Hamolsky, the nurse midwife conducting the delivery was notified that Dr. Lowe could not supervise. Dr. Lowe testified that after receiving a "hysterical" phone call from the midwife, he called the nursing supervisor at WIH to tell her that he did not understand the problem. Dr. Lowe was obliged to find another physician to supervise the delivery by his nurse midwife. Dr. Lowe immediately requested a meeting with the hospital to explain the suspension of his privilege to supervise nurse midwives. At this meeting hospital officials explained that the reason for the revocation was the apparent directive of the Board through Dr. Hamolsky and that they would allow him to resume supervision of nurse midwives "immediately upon information from Dr. Hamolsky and the Board...."

Dr. Lowe testified that he was never formally notified by letter of the suspension of his privilege at WIH to supervise nurse midwives. He did not, however, appeal WIH's imposition of these restrictions on his privileges. Dr. Lowe stated that he did not challenge WIH's action because he believed that WIH's interpretation of the Consent Order was consistent with his own and because he believed that "the problem was only with the Board."

In the two days following WIH's suspension of Dr. Lowe's privilege to supervise midwives, Clabots drafted a letter requesting clarification of Dr. Lowe's status. On November 17, 1989, Clabots' letter was sent to Dr. Hamolsky under the signature of WIH's President, Thomas G. Parris, Jr. The letter described the hospital's belief that Dr. Hamolsky's November 1st letter contained "contradictory directives" on the Board's position on the nurse midwife issue. It continued:

> Turning to your letter of November 1, Item No. 3 of the fourth paragraph ... states that Dr. Lowe is not to supervise nurse midwives in the Hospital pending further action of the Board. This language is inconsistent with the last sentence of the letter, which states that the original Consent Order remains in full force and effect and which we understand to mean that Section 12 of the Consent Order is still operative and which provides in part as follows:
>
> > 12. Respondent (Dr. Lowe) and his staff shall strictly adhere to the WIH protocols for use of certified nurse midwives....
>
> Moreover, it is my understanding that you recently informed Leland Clabots ... that the Board's position was that Dr. Lowe is prohibited from supervision of nurse midwives at the Hospital. This statement by you seems to compound our confusion on this matter.

The Hospital believes that the Consent Decree per se does not prohibit Dr. Lowe's supervision of nurse midwives. The remaining restrictions ... in the Consent Decree do not affect his ... privileges at the Hospital and do not impair his authority to supervise nurse midwives under existing Hospital protocols. However, your letter raises a serious question about the Board's position on this matter. Therefore, until this matter is clarified in writing to our satisfaction, the Hospital will abide by the apparent directive of the Board and will not permit Dr. Lowe to supervise nurse midwives. However, we urge you to clarify this matter as soon as possible for the benefit of the Hospital, as well as Dr. Lowe.

Although Dr. Conklin's testimony was somewhat unclear on the issue, it appears that the members of Investigating Committee I were neither apprised of the existence of the letter from WIH, nor of the phone call between Hamolsky and Clabots on November 15th. Furthermore, Investigating Committee I did not convene formally to discuss the midwife issue.

Dr. Hamolsky recalled that upon receiving WIH's letter he took it to the members of Investigating Committee I, who informed him that his letter of November 1st had been too "cryptic." Acting on this advice, Dr. Hamolsky drafted a new letter to WIH, which he did not circulate with Investigating Committee I members. In the new letter, which was sent to WIH on November 22, 1989, Dr. Hamolsky attempted to outline more fully the reasoning underlying his interpretation of the Consent Order.

Dr. Hamolsky's four-page letter began by noting that in the Consent Order the Board had clearly expressed its concern that Dr. Lowe's overly relied on nurse midwives. Dr. Hamolsky's letter indicated that his November 1st letter had been intended as a response from Investigating Committee I to WIH's April 26 request for clarification as to the status of restrictions still applicable to Dr. Lowe under the Order following the restoration of his full privi-

leges at WIH. After outlining in greater detail the development of the disagreement between Dr. Lowe and Investigating Committee I on the midwife issue, the letter continued:

[The Hearing Committee] voted unanimously to deny the appeal of [Dr. Lowe] from the decision of the Investigating Committee I.

Therefore there has been no change mutually accepted and ordered in the original Consent Order which is the clear basis for our judgment that the original Consent Order remains in full force and effect. That is the basis for my response to the urgent inquiry of the current status by Leland Clabots that, currently, Dr. Lowe is prohibited from supervision of nurse midwives at the hospital—a response given in the out-of-state absence of our legal counsel. I enclose a copy of a letter of November 9, 1989 from our legal counsel to legal counsel for Dr. Lowe.

I do not see any "contradictory directives concerning the Board's position on the supervision by Dr. Lowe of nurse midwives at the Hospital" nor any "compounding of confusion" by my response to Mr. Clabots.

The Board remains prepared to work with all concerned to continue to fulfill its statutory obligations and render due consideration for Dr. Lowe and his patients.

Dr. Hamolsky considered his letter of November 22 "the final judgment" of Investigating Subcommittee I on the midwife issue.

Dr. Lowe testified that WIH's suspension of his midwife privilege impaired his practice because his nurse midwives and patients were never certain as to which physician would be available to supervise deliveries at WIH. While Dr. Lowe retained privileges to perform deliveries himself, the loss of his authority to supervise nurse midwives affected their ability to schedule deliveries at WIH. Because of the uncertainty surrounding Dr. Lowe's status under the consent order, the two midwives associated with his practice in-

formed him that they would have to seek alternative employment.

### D. *The § 1983 Action.*

Several weeks after WIH's receipt of Dr. Hamolsky's letter of November 22nd, Dr. Lowe brought suit under 42 U.S.C. § 1983 in district court for injunctive and declaratory relief against Dr. Hamolsky and Dr. Scott, the Board's Chairman, in their official capacity. Dr. Hamolsky was also sued in his individual capacity for damages claimed under § 1983. The complaint charged that Dr. Hamolsky's representations to WIH concerning the status of Dr. Lowe's medical license, issued under color of the authority of the Board of Medical Licensure and Discipline, caused WIH to suspend Lowe's privilege to supervise nurse midwives. The complaint stated two different theories of a violation of the procedural guarantees of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Due Process Clause of the Rhode Island Constitution: (1) a deprivation without due process of Dr. Lowe's property interest in his license to practice medicine; and (2) a deprivation without due process of his property interest in his hospital privilege to supervise nurse midwives at WIH. On December 15, 1989, the district court denied Dr. Lowe's request for a T.R.O. against Dr. Hamolsky and the rest of the Board.

Following the institution of Dr. Lowe's suit, and initial depositions of the defendants, Dr. Hamolsky on February 2, 1990, again wrote WIH, in an attempt to "clarify any and all apparent confusion" generated by his letter of November 1st and phone call with Clabots on November 15th. The letter continued:

[P]lease be advised[ ] that my communications on behalf of the Investigating Committee were never intended ... to intimidate, encourage, suggest, direct or affect in any manner, the position of the Hospital regarding the supervision by Dr. Lowe of midwives. Therefore, insofar as any communications up to this point have impacted on your position regarding such supervision I ask you to disregard totally these communications in favor of this letter.

In your deposition you acknowledge that the Board has no regulatory authority over the Hospital.... No such authority is intended by this letter. Nor was any regulatory authority over the Hospital by the Board ... ever intended, implied or asserted.

The Hospital has the authority and responsibility to make its own decision regarding supervision of nurse midwives. The Consent Decree as written does not restrict Dr. Lowe's ability to supervise midwives except as outlined under Paragraph 12 of that Consent Decree wherein it states that Dr. Lowe and his staff shall "strictly adhere to the WIH protocols for use of certified nurse midwives."

I trust that this letter has removed any "risk management implications" of my prior communications on behalf of the Investigating Committee. Therefore, the Hospital must make its own decision regarding supervision of nurse midwives.

Immediately after receipt of Dr. Hamolsky's letter, on February 6, 1990, WIH restored Dr. Lowe's privilege to supervise nurse midwives.

Although the restoration of Dr. Lowe's midwife privilege mooted those aspects of his suit seeking declaratory and injunctive relief, the suit continued on the damages claims against Dr. Hamolsky. Notwithstanding the restoration of Dr. Lowe's full privileges, his midwives left his practice in the spring of 1990. Dr. Hamolsky's damages claim included their departure as part of the overall damage to his practice allegedly caused by Dr. Hamolsky's actions.

## II. DISCUSSION

Dr. Lowe's appeals the district court's grant of a directed verdict overturning the jury's award of damages on his § 1983 claim against Dr. Hamolsky. He challenges the finding of the district court that there was insufficient evidence to allow a jury to find that Dr. Hamolsky interfered with his protected property interest in his privilege to supervise nurse midwives at WIH.

Dr. Lowe also appeals on the ground that the court erroneously failed to charge on his alternative liability theory: that he was deprived without due process of his property interest in his medical license. He contends that because his property interest in his medical license was established as a matter of law, this was an alternative theory of liability that would have resulted in the same damages as the claim that went to the jury. He therefore argues that this error can be corrected by reinstating the jury verdict on damages. Finally, Dr. Lowe also argues that the district court abused its discretion in granting a conditional new trial in the event of reversal by this court of its award of a directed verdict in favor of Dr. Hamolsky.

Before turning to an analysis of the district court's rulings, we first review the case law addressing the issue of under what circumstances a physician has a protected property interest in his license to practice medicine and/or his hospital privileges.

A. *Due Process Constraints on the Revocation of Medical Licenses and Hospital Privileges.*

■ In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that the "requirements of due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Id.* at 569, 92 S.Ct. at 2705. In *Roth,* the Court outlined in general terms the attributes of the "property" interests subject to the constraints of the Due Process Clause:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709. According to the Court, property interests are not defined by the Constitution. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Id. See also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Chongris v. Board of Appeals,* 811 F.2d 36, 43 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). In a § 1983 action, any claim of a violation of procedural due process necessarily includes a showing that the conduct complained of deprived the plaintiff of a cognizable property interest and that the conduct was committed by a person acting under color of state law. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981).

■ This circuit recognizes that a physician enjoys a protected property interest in a license to practice medicine. In *Beauchamp v. De Abadia,* 779 F.2d 773 (1st Cir.1985), we held that the plaintiff physician "unquestionably had a protected interest in his right to practice medicine. A clearer example of the 'new property' is not easily imagined." *Id.* at 775 (citations omitted).[4] In *Kudish v. Bradley,* 698 F.2d 59 (1st Cir.1983), we also approved the proposition that "a license to practice medicine, once acquired, is a valuable property right protected by the fourteenth amendment." *Id.* at 61. In cases in which there has been some question as to whether the plaintiff complaining of a deprivation of a property interest actually was in possession of a medical license, our tendency has been to accept the applicability of due process constraints. *See Martinez–Velez v. Simonet,* 919 F.2d 808, 810 (1st Cir.1990) (failure to issue license after veterinarian obtained passing score on state licensing examination might in some circumstances

---

**4.** *Beauchamp* involved a physician who obtained partial approval of a license to practice medicine from Puerto Rico's Board of Medical Examiners, only to have the grant of his license withheld because of allegations that he failed to complete his medical school curriculum. *Id.* at 774. We accepted the district court's assumption that the plaintiff had, in effect, received his

license and that the refusal of the Board of Examiners to issue his license was tantamount to a revocation of that license. *Id.* at 774–75, n. 1. Accordingly, we upheld the district court's ruling that the plaintiff was entitled to a full hearing prior to the revocation of his license. *Id.* at 775.

constitute a deprivation of due process rights); *Beauchamp,* 779 F.2d at 775 & n. 1 (district court's assumption that partial issuance of medical license created "vested" property right not clearly erroneous). Such an approach is consistent with the Court's observation that the "Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth,* 408 U.S. at 576, 92 S.Ct. at 2708.

 Our cases thus establish that the revocation of the license of a practicing physician must comport with the requirements of procedural due process. Due process requires notice of the charges and an opportunity to be heard. *See Martinez-Velez,* 919 F.2d at 811, n. 4 (citing *Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970)); *Amsden v. Moran,* 904 F.2d 748, 752 (1st Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991) (noting that revocation of plaintiff's land surveying license precisely the sort of "deprivation of a property interest sufficient to animate due process protections," and applying *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

All the states in this circuit and the Commonwealth of Puerto Rico have adopted statutes governing the revocation by their licensing boards of a physician's license to practice medicine. *See* Me.Rev.Stat.Ann. tit. 32, § 3282–A (West 1991); Mass.Gen. Laws Ann. ch. 112, § 5 (1991); N.H.Rev. Stat.Ann. ch. 329, § 17 (1990); P.R.Laws Ann. tit. 20, § 52 (1989); R.I.Gen.Laws § 5–37–5.1 (1991). A common feature of these statutes is the requirement that in disciplinary proceedings affecting the status of a physician's license, the physician is entitled to notice and a hearing before the licensing board. The focus in any due process claim under § 1983 challenging the revocation or restriction of a physician's property interest in a medical license is therefore usually on the issue of the adequacy of the process provided by the state licensing board.

Whether a physician's hospital privileges are a property interest subject to due process protections raises a question quite different from that presented in suits concerning medical license revocations or restrictions. In this circuit we have never addressed a challenge to the suspension of a physician's hospital privileges based on a claim of a violation of due process. In other circuits, however, due process challenges involving the suspension or denial of hospital privileges have arisen with some frequency.

In cases involving public hospitals, several circuits have acknowledged that in certain circumstances a physician's privileges constitute a property interest whose revocation or suspension by the hospital must satisfy the requirements of due process. *See Darlak v. Bobear,* 814 F.2d 1055, 1061 (5th Cir.1987) ("It is well-settled in this circuit that a physician's staff privileges may constitute a property interest protected by the due process clause...."); *Yashon v. Hunt,* 825 F.2d 1016, 1022–27 (6th Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2015, 100 L.Ed.2d 602 (1988) (reviewing for conformity with principles of due process public hospital's refusal to reinstate neurologist's hospital privileges); *Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384, 1394–95 (10th Cir.1988) (while physician might have had property interest in his medical privileges, no due process violation occurred where hospital provided pre-suspension hearing); *Shahawy v. Harrison,* 875 F.2d 1529, 1532–33 (11th Cir.1989) (although physician had protected property interest in staff privileges, public hospital's termination of these privileges comported with due process).

 All these cases are premised on the assumption that when a public hospital grants a physician hospital privileges, and undertakes explicitly or implicitly not to revoke these privileges without appropriate process, a protected property interest is created. For example, in *Northeast Georgia Radiological Assocs., P.C. v. Tidwell,* 670 F.2d 507, 510–11 (5th Cir. Unit B 1982), the Fifth Circuit reviewed the revocation of privileges from a physician with whom a

**336**

public hospital had entered an exclusive services contract. The services contract incorporated certain hospital by-laws requiring notice and a hearing prior to corrective action against a staff physician. *Id.* at 511. The Fifth Circuit found that "the contract, incorporating the medical staff by-laws, and the by-laws *per se*, established 'the existence of rules or mutually explicit understandings,' and sustained [the] claim to a protected property interest." *Id.* (citations omitted). As the basis for its decision, the *Tidwell* court relied on the Supreme Court's holding in *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), that a state college teacher could have acquired a "legitimate claim of entitlement" to continued employment where state officials fostered the understanding that he would not be terminated absent proper cause. *Perry,* 408 U.S. at 602, 92 S.Ct. at 2700.

*Tidwell*'s application of *Perry* rests on the proposition that a public hospital creates a property interest within the meaning of *Roth* if, in granting hospital privileges to its staff physicians, the hospital also fosters the understanding that these privileges will not be terminated without some form of process. Other decisions in the circuit courts have applied a similar analysis. *See Darlak,* 814 F.2d at 1061–62 (public hospital's regulations providing for a hearing prior to termination of staff privileges established property interest); *Yashon,* 825 F.2d at 1022–24 (assuming existence of property interest, and finding that internal hearing procedures established by public hospital satisfied due process); *Setliff,* 850 F.2d at 1395 (while public hospital's requirement of cause to terminate staff privileges may have established property interest, no due process violation shown because pre-termination hearing was provided); *Shahawy,* 875 F.2d at 1532 (applying *Tidwell* directly). *See also Caine v. Hardy,* 943 F.2d 1406, 1411 (5th Cir.1991) (because physician could not be deprived of staff privileges without just cause, tenure on public hospital's medical staff was property interest).

A state may also directly create a property interest in physicians' hospital privileges at public and private hospitals, either by statutory enactment or through its decisional law. *See Brooks v. Arlington Hosp. Ass'n,* 850 F.2d 191, 198 (4th Cir.1988) (noting Virginia statute that imposes a requirement of a written statement of reasons for hospital's suspension or termination of privileges); *Pinhas v. Summit Health, Ltd.,* 894 F.2d 1024, 1033–34 (9th Cir.1989), *aff'd on other grounds,* —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (discussing California statute requiring that both public and private hospitals incorporate certain physician peer-review procedures in their by-laws); *Lew v. Kona Hosp.,* 754 F.2d 1420, 1424 (9th Cir.1985) (property right in employment as probationary hospital staff member recognized by Hawaii state courts).

■ Where state law directly establishes a property interest in hospital privileges, all of the state's licensed physicians are entitled to due process in decisions affecting their hospital privileges. The public or private status of the hospital at which the physician holds privileges then becomes irrelevant to the issue of whether a property interest exists because it is the state itself, rather than the public hospital as state employer, that has directly conferred the physician's "legitimate claim of entitlement" to the protected interest in privileges. *See Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 119, 121 (7th Cir. 1986) (recognizing that private hospital's termination of physician's privileges was subject to statutorily-mandated Indiana peer review process which created property interest, but finding no state action for purposes of § 1983's requirement that deprivation of property interest be caused by state actor); *Pinhas,* 894 F.2d at 1033 (finding property interest protected by California law, but rejecting on state action grounds physician's procedural due process claim against private hospital based on privileges revocation); *Lew,* 754 F.2d at 1424 (staff privileges were property right under Hawaii common law, and adequate process was provided for their revocation).

## B. *The Grant of a Directed Verdict*

■ With these principles in mind, we now review the district court's grant of a directed verdict on Dr. Lowe's claim that Dr. Hamolsky's actions deprived Dr. Lowe of a protected property interest in his privilege to supervise nurse midwives at WIH. Our review of a trial court's grant of a directed verdict is the same as that applied to review of the grant of judgment n.o.v.: "[T]he evidence and all reasonable inferences extractable therefrom must be examined in the light most favorable to the nonmovant and [a directed verdict] 'should be granted only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion.'" *Veranda Beach Club Ltd. Partnership v. Western Surety Co.,* 936 F.2d 1364, 1383 (1st Cir.1991) (citations omitted). *See also Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987) ("[W]e may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.").

The district court granted the directed verdict in favor of Dr. Hamolsky in a ruling from the bench made immediately after the jury verdict for Dr. Lowe:

[T]he real question that the Court must address in passing on the motion for directed verdict is this question of the property interest. The rest of the elements of the Plaintiff's case it seems to me are certainly within the pale of the standard that the Court must apply in ruling on a motion for directed verdict....

....

The interest at issue as it's stated ... is the Plaintiff's ability to supervise nurse midwives during deliveries at Women and Infants Hospital. The plaintiff contends that that ability is a constitutionally protected interest....

To establish that the Plaintiff must prove that he had a legitimate claim of entitlement to supervise nurse midwives at Women and Infants Hospital. A mere expectation that he would be allowed to do so or continue to do so, is not sufficient. There must be a legally recognized or enforceable right that derives from law, contract or some mutually explicit understanding.

In this case there was no evidence from which one could reasonably find the existence of such a right. And in saying that, I do not fault the Jury. I think it was primarily a question of law....

The facts bearing on the issue are really not in dispute. The ability to supervise nurse midwives at Women and Infants Hospital, ... is a staff privilege that is conferred by the hospital. There was no evidence presented here as to any limitations on the hospital's right to withdraw that privilege at any time or for any reason either as to Dr. Lowe individually or as to any other obstetricians on the staff....

Women and Infants Hospital's protocols are in evidence. But they say nothing about whether a physician has a continuing right to supervise nurse midwives or whether the hospital is required to establish good cause before terminating or suspending that privilege. The protocols don't even make any provision for either a pre-termination or a post-termination hearing.... [There] is no where near sufficient evidence to support a finding that such a procedure existed. The fact that [WIH's President, Mr. Parris] believed that there was some unspecified procedure that may have entitled physicians to a hearing with an attorney falls far short of anything that would establish a legitimate claim of entitlement to supervise nurse midwives.... Dr. Lowe had no right to appeal the hospital's decision not to allow him to supervise nurse midwives any more because that was not an incident of his ... privileges. In fact, the evidence indicates that Dr. Lowe did not even attempt to appeal the hospital's determination.

It would appear that the district court ruled that Dr. Lowe failed to introduce sufficient evidence to show that WIH, through its by-laws or internal procedures, guaranteed some form of pre-deprivation process to its staff physicians if their privileges were to be revoked or limited. The

court's underlying legal analysis depends on the assumption that if WIH *had* guaranteed adequate process to its staff physicians, it would thereby have created a protected property interest.

We agree with the district court's conclusion that Dr. Lowe's claim of a deprivation of a protected property interest in his privilege to supervise nurse midwives was untenable. We do so, however, not because of the insufficiency of the evidence, but because we find as a matter of law that Dr. Lowe could not have established a protected property interest in his privilege to supervise nurse midwives at WIH.

■■■ As our review of the case law makes clear, there are only two ways in which a physician's privileges acquire the status of a property interest protected by the due process clause. A public hospital, as a state employer, may create a property interest in privileges through its own regulations guaranteeing that these privileges will not be revoked without cause or a hearing. Or, in the alternative, a state may create the property interest in privileges directly by imposing the requirement, either by statute or through its courts, that all hospitals provide physicians adequate process in decisions affecting privileges. In either case, any protected property interest in hospital privileges is state-conferred: "The hallmark of property, the Court has emphasized, is an individual entitlement *grounded in state law,* which cannot be removed except 'for cause.'" *Logan v.*

*Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) (citations omitted and emphasis added).

■■■ Dr. Lowe has never claimed that WIH is a public hospital.[5] He therefore cannot rely on the case law holding that a public hospital, through its by-laws or other understandings fostered among its staff physicians holding privileges, thereby creates a property interest in those privileges. In this respect, the district court misapplied the law when it allowed the jury to review WIH's internal procedures for the purpose of determining whether WIH undertook to provide its staff physicians with adequate process prior to actions affecting their privileges. Any dispute as to whether Dr. Lowe did or did not establish that WIH followed *any* procedures in regard to its restrictions of Dr. Lowe's privileges is immaterial in this case because the internal procedures of a private hospital like WIH are not sufficient by themselves to establish a protected property interest under state law.

■■■ Nor did Dr. Lowe establish that Rhode Island accorded him a property interest in hospital privileges directly, thereby negating the relevance of the issue of the public or private status of WIH. Dr. Lowe has failed to identify, and we have not found, any Rhode Island statute or decision of the Rhode Island Supreme Court requiring that the revocation of hospital privileges comport with due process.[6]

---

5. There was no argument below that WIH, by virtue of its receipt of governmental funding or susceptibility to extensive government regulation, became a state actor. As Dr. Lowe concedes in his brief on appeal, this circuit has squarely rejected this approach. *See, e.g., Mendez v. Belton,* 739 F.2d 15, 18 (1st Cir.1984) ("[E]very circuit that has addressed the issue has decided that extensive government regulation and the receipt of [federal] construction funds, Medicare and Medicaid funds, and tax-exempt status do not transform an otherwise private hospital into a governmental actor.").

6. Dr. Lowe's brief on appeal lists decisions from several other jurisdictions that are not pertinent to the issue of whether Rhode Island has imposed a requirement of adequate process in the privileges determinations made by its hospitals. The only Rhode Island case even remotely on

point is *Hagan v. Osteopathic Gen. Hosp.,* 102 R.I. 717, 232 A.2d 596, 600 (1967). In *Hagan,* a physician sought judicial review of a private hospital's refusal to grant him staff privileges because he claimed that the hospital's procedures had denied him due process. Finding that there was no merit to the physician's due process claim, the Rhode Island Supreme Court declined to adopt the approach of other state courts which had decided to consider private hospitals state actors if they received federal funds and were subject to state regulation. *Id.* 232 A.2d at 600. The Rhode Island Supreme Court thus failed to adopt, or even to pass on, the view of some state courts that this expanded definition of what constitutes a "public" hospital entitles a physician to assert that a protected property interest exists in hospital privileges. *Hagan* appears to be the first and last word

There can therefore be no § 1983 claim that Dr. Hamolsky deprived Dr. Lowe of a protected property interest in the privilege to supervise nurse midwives at WIH because such a property interest is not recognized under Rhode Island law.

### C. Should the Jury Have Been Instructed on Dr. Lowe's Claim That His Property Interest in His Medical License Was Infringed?

Our conclusion that Dr. Lowe had no property interest in his privilege to supervise nurse midwives at WIH does not, however, end our inquiry. Dr. Lowe argues that the district court erred when it failed to instruct the jury on his theory that Dr. Hamolsky's actions interfered with his property interest in his license to practice medicine. He further urges that we should find that the jury should have been instructed as a matter of law that there was a protected property interest in his medical license. He then maintains that a new trial is unnecessary in the event we adopt this position because the jury otherwise found that Dr. Lowe had satisfied his burden of proof on all the other elements of his claim that Dr. Hamolsky deprived him of a property interest without due process. Dr. Lowe believes that the analysis under either theory is the same. Dr. Lowe takes the position that the district court's erroneous instruction as to the property interest at issue in this case was harmless error because the jury found in his favor on the other elements necessary to establish his § 1983 claim and that the damages under either theory were the same.

#### 1. Was There a Property Interest?

 The trial court's ruling granting Dr. Hamolsky's request for a directed verdict sets forth the reasons for its refusal to instruct the jury on Dr. Lowe's claim that his property interest in his license to practice medicine was infringed:

> The property at issue is not the Defendant's license to practice medicine or even his ability to deliver babies. The plaintiff was never deprived of those privileges, at least not by any actions attributable to the Defendant in this case. The Plaintiff was able at all times as a far as the evidence shows to practice medicine and to himself deliver babies.

The district court's ruling hinges on the premise that the jury as a matter of law could not have found that a restriction on Dr. Lowe's license preventing him from supervising nurse midwives was a cognizable deprivation of his protected property interest in that license.

 We think the district court's refusal to instruct the jury on these grounds was error. We disagree with the district court's intimation that Dr. Hamolsky's alleged interference with Dr. Lowe's medical license, even if proven, could not have amounted to a deprivation of his property interest in that license because it only deprived him of the authority to supervise nurse midwives. The case law clearly recognizes a protected property interest in a physician's license to practice medicine. We reject the notion that the physician's property interest in his license extends only to those aspects of the practice of medicine that the physician himself performs. The Seventh Circuit has recognized that when a state grants a medical license, it "create[s] a legitimate claim of entitlement to a 'clean' license...." *Fleury v. Clayton,* 847 F.2d 1229, 1233 (7th Cir.1988) (reversing district court's ruling that censure of physician did not amount to deprivation of property interest in his medical license subject to due process protections). We agree with this analysis, and hold that Dr. Lowe enjoyed a protected property interest in that part of his license that gave him the authority to supervise nurse midwives at WIH, or indeed at any other Rhode Island hospital.

#### 2. Was there a Procedural Due Process Claim Under § 1983?

 We next examine the more difficult question of whether the evidence presented by Dr. Lowe warranted an instruction to the jury that he was entitled to

from the Rhode Island Supreme Court on this

issue.

recover damages on the theory that Dr. Hamolsky deprived him of his property interest in his medical license by imposing additional restrictions without due process.

In *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court reviewed the necessary elements of a procedural due process claim:

> A § 1983 action may be brought for a violation of procedural due process, but here the existence of state remedies *is* relevant in a special sense. In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*.... The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Id.* at 125–26, 110 S.Ct. at 983 (citations omitted and emphasis in original). Although recognizing that due process is "a flexible concept that varies with the particular situation," *id.* at 127, 110 S.Ct. at 984, the Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Id.* (citations omitted).

█ When a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, however, the Court has repeatedly emphasized that the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies provided by the state. *See id.* at 128–30, 110 S.Ct. at 984–85 (discussing *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Hud-*

*son v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The Court has reasoned that when a state official is not acting pursuant to established state procedure, the state is not in a position to provide anything other than such postdeprivation remedies:

> [In *Parratt*], [t]his Court ruled that the tort remedy was all the process the prisoner was due [after prison employees' negligent loss of his property], because any predeprivation procedural safeguards that the State did provide, or could have provided, would not address the risk of *this kind* of deprivation.

*Id.* 494 U.S. at 129, 110 S.Ct. at 985. This reasoning applies to both intentional or negligent unauthorized conduct that deprives a plaintiff of a protected interest, because the state " 'can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct.' " *Id.* at 130, 110 S.Ct. at 985 (quoting *Hudson,* 468 U.S. at 533, 104 S.Ct. at 3203). In *Hudson,* the Court held that the adequacy of state postdeprivation tort remedies precluded a § 1983 action by a prisoner whose property was deliberately and maliciously destroyed by a guard during a search of his cell. 468 U.S. at 536, 104 S.Ct. at 3205.

█ *Parratt* and *Hudson* teach that if a state provides adequate postdeprivation remedies—either by statute or through the common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct occasioned the deprivation. *See Hudson,* 468 U.S. at 533 & n. 14, 104 S.Ct. at 3204 & n. 14; *Parratt,* 451 U.S. at 537, 543–44, 101 S.Ct. at 1913, 1916–17. The Court's recent decision in *Zinermon* reemphasizes the rationale underlying *Parratt* and *Hudson:* "[N]o matter how significant the private interest at stake and the risk of its erroneous deprivation, the State cannot be required constitutionally to do the impossible by providing predeprivation process." *Zinermon,* 494 U.S. at 129, 110 S.Ct. at 985 (citations omitted).

Yet *Zinermon* also elaborates the due process inquiry in cases of unauthorized official conduct by placing additional scrutiny on the question of whether the official conduct is truly "random" or unforeseeable. *Zinermon* involved a claim of a deprivation of liberty without due process brought against staff members and physicians at Florida State Hospital who admitted the plaintiff Burch to the hospital as a "voluntary" mental patient. *Id.* at 115, 110 S.Ct. at 977. Burch alleged that at the time of his admission he was in no condition to have executed forms indicating that his admission was voluntary. Burch claimed that he should instead have been afforded the protection of Florida's involuntary admission procedure. He argued that hospital officials violated his due process rights by failing to employ this involuntary placement procedure. *Id.* at 118–24, 110 S.Ct. at 979–82.

The hospital officials, on the other hand, insisted that Burch failed to state a claim under § 1983. They argued that Burch's complaint alleged that their conduct was random and unauthorized. Therefore, they urged that *Parratt* and *Hudson* limited the procedural due process inquiry to the question of the adequacy of Florida's postdeprivation remedies. The hospital officials argued that there was no § 1983 claim because Burch did not challenge the adequacy of these postdeprivation remedies. *Id.* 494 U.S. at 115, 110 S.Ct. at 977.

Although the Court found the rule of *Parratt* and *Hudson* equally applicable to claims involving deprivations of liberty and property, *id.* 494 U.S. at 131–32, 110 S.Ct. at 986, it nonetheless refused to conclude that Burch had failed to state a claim under § 1983. The Court ruled that *Parratt* and *Hudson* were not controlling in Burch's case because predeprivation safeguards might have prevented the kind of deprivation that Burch suffered. *Id.* 494 U.S. at 135–37, 110 S.Ct. at 988–89. The Court refused to accept the hospital officials' contention that Florida could not have prevented them from making random and unauthorized errors during the admission of mental patients. Instead, it found that Florida could have adopted procedures that would

have ensured that hospital officials conducted an appropriate examination of patients' competency prior to any admission on either a voluntary or involuntary basis. *Id.*

The Court stated three reasons for distinguishing *Parratt* and *Hudson*. First, it found that it was hardly "unpredictable" or "unforeseeable" that hospital officials would need to examine patients' competency prior to their admission to a mental hospital. Thus, it reasoned, Florida could more precisely anticipate the deprivation committed by its hospital officials than state prison authorities in *Parratt* and *Hudson* could anticipate random and unauthorized behavior by prison guards. *Id.* 494 U.S. at 136, 110 S.Ct. at 989. Second, the Court found that because the deprivation experienced by Burch could have been more easily anticipated than those of the prisoners in *Parratt* and *Hudson*, there was a greater likelihood that Florida could have provided predeprivation process that would have averted Burch's improper admission. *Id.* 494 U.S. at 137–38, 110 S.Ct. at 989–90. Finally, the Court concluded that because Florida had delegated the hospital officials broad authority to "effect the very deprivation complained of here," their conduct could not be said to be "unauthorized" in the same sense as the destruction of prisoners' property by the prison guards in *Parratt* and *Hudson*. *Id.* 494 U.S. at 138, 110 S.Ct. at 990.

*Zinermon* requires that courts scrutinize carefully the assertion by state officials that their conduct is "random and unauthorized" within the meaning of *Parratt* and *Hudson*, where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state postdeprivation remedies. Other circuit courts that have interpreted *Zinermon* have arrived at a similar conclusion. *See Caine v. Hardy*, 943 F.2d 1406, 1413 (5th Cir.1991) (en banc) ("*Zinermon* thus requires a hard look at a *Parratt/Hudson* defense to determine whether the state officials' conduct, under all the circumstances, could have been adequately foreseen and addressed by procedural safe-

guards."); *Easter House v. Felder,* 910 F.2d 1387, 1402 (7th Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991) (finding that *Zinermon* distinguished *Parratt* and *Hudson* on their facts, and concluding that *"Zinermon* holds only that predictable deprivations of liberty and property which flow from authorized conduct are compensable under § 1983.").

With these principles in mind, we return to the question of whether the evidence presented by Dr. Lowe was sufficient to require an instruction on his claim that Dr. Hamolsky's communications with WIH deprived him without due process of his property interest in his medical license. We assume for purposes of discussion that the jury had sufficient evidence to find that Dr. Hamolsky acted under color of state law, and instead focus on the two interrelated factual issues that are at the heart of Dr. Lowe's claim: (1) whether Dr. Hamolsky's communications with WIH caused a deprivation of his property interest in his license, and (2) whether Dr. Hamolsky's communications with WIH were authorized by Rhode Island's Board of Licensure and Discipline.

Because it was necessary for Dr. Lowe to show that Dr. Hamolsky's communications with WIH caused a deprivation of his property interest in his license, Dr. Lowe's case-in-chief sought to establish that Dr. Hamolsky misrepresented the position of the Board to officials at WIH in order to cause them to rescind Dr. Lowe's hospital privilege to supervise nurse midwives. Obviously crucial in this regard was the "emergency" phone call between Leland Clabots at WIH and Dr. Hamolsky immediately prior to WIH's suspension of Dr. Lowe's privilege to supervise nurse midwives on November 15, 1989. The jury heard two different descriptions of events. Clabots testified that Dr. Hamolsky told him that "it was the position of the Board that Dr. Lowe could not supervise midwives" and at no time indicated that view was merely that of Investigating Committee I. Dr. Hamolsky, on the other hand, testified that he had merely reiterated the view expressed in his letter of November 1,

1989, that a dispute existed between Dr. Lowe and the members of Investigating Committee I over interpretation of the Consent Order. Dr. Hamolsky insisted that he told Clabots that the Hearing Committee had "denied [Dr. Lowe's appeal] and, therefore, in the judgment of the investigative committee and myself this returned us to the consent order."

If the jury accepted Clabots' version of events, we think that this would have established that Dr. Hamolsky caused WIH to suspend Dr. Lowe's privilege to supervise nurse midwives. A representation by Dr. Hamolsky that the Board thought Dr. Lowe's license did not permit him to supervise nurse midwives would amount to a deprivation of Dr. Lowe's property interest in his license because any reasonable Rhode Island hospital official in Clabots' position would have felt duty bound to restrict Dr. Lowe's privileges. Clabots' testimony emphasized his belief that it was necessary to suspend part of Dr. Lowe's privileges at WIH because the *Board* had required it:

> Dr. Hamolsky, as the Chief Administrative Officer of the Board of Medical Licensure and Discipline, had told me that based upon the Board's actions, that Dr. Lowe was not able to supervise midwives. Given that response from a state agency licensing physicians, I as a hospital licensed by the State of Rhode Island, felt an absolute need to comply with that.
>
> Secondly, as a hospital and in the malpractice climate in which we live, to have permitted a physician who according to a state official who said his license didn't cover that [sic] should anything, any mishap, any mal-occurrence occur, I would have jeopardized the hospital's malpractice status in any kind of malpractice suit.

We can only conclude that it was Dr. Lowe's objective at trial to show that Dr. Hamolsky's communications with WIH, and with Clabots in particular on November 15, 1989, caused the deprivation of Dr. Lowe's property interest in his medical license by misrepresenting the views of the

Board. On appeal, Dr. Lowe continues to urge that the jury could properly have credited Leland Clabots' recollection of the phone call rather than that of Dr. Hamolsky.[7]

We assume for present purposes that a deprivation of Dr. Lowe's property interest in his medical license was caused by Dr. Hamolsky's misrepresentation of the Board's position during the phone call with Clabots. We must determine next whether Dr. Lowe was entitled to an instruction permitting him to recover damages under § 1983. After review of the principles established in *Parratt, Hudson,* and *Zinermon,* we conclude that Dr. Lowe would not have been entitled to an instruction on his procedural due process claim because the evidence that would have established that Dr. Hamolsky caused WIH to restrict Dr. Lowe's privileges also would have established that Dr. Hamolsky's behavior was "random and unauthorized." Because we find *Parratt* and *Hudson* controlling, we now hold that Dr. Lowe was not entitled to an instruction on a procedural due process claim under § 1983 because he did not challenge the adequacy of Rhode Island's postdeprivation tort remedies.

After review of the trial transcript, we have found no evidence that shows that there was ever an official determination by the Board—or more precisely, by the Hearing Committee on behalf of the Board—that the Consent Order prohibited Dr. Lowe from the supervision of nurse midwives. Any representation by Dr. Hamolsky to Leland Clabots at WIH that this was in fact the Board's position would necessarily have been false. Nor was there evidence to suggest that in his capacity as Chief Administrative Officer of the Board, Dr. Hamolsky was entitled to make such a determination independently of the Board itself. Indeed, if Dr. Hamolsky did misre-

present the views of Investigating Committee I as that of the Board, that misrepresentation deliberately circumvented procedures already established under the Consent Order that gave the Hearing Committee exclusive authority to resolve disputes between Dr. Lowe and Investigating Committee I over the status of Dr. Lowe's license.

In these circumstances Dr. Hamolsky's behavior would have been precisely the kind of unauthorized and unforeseeable official conduct that is impossible for the state to prevent or deter through the imposition of predeprivation procedures. We find this case distinguishable from *Zinermon* because of the absence of any of the factors identified by the Court as the basis for its rejection of *Parratt* and *Hudson's* rule that the procedural due process inquiry in cases of random and unauthorized official conduct is limited to examination of the sufficiency of postdeprivation remedies.

It is difficult to imagine how it would have been "predictable" or "foreseeable" that the Chief Administrative Officer of Rhode Island's Board of Medical Licensure and Discipline would ignore established procedures for the modification of the Consent Order restricting Dr. Lowe's license, and would instead intentionally misrepresent to WIH the Board's position on the status of Dr. Lowe's license. *Zinermon's* analysis depended on the Court's assumption that because the question of a patient's competency would certainly arise in some, if not most, patient admissions, the liberty deprivation experienced by Burch had the potential to occur with some frequency. It was Florida's failure to provide additional predeprivation process to assure the proper evaluation of patients' competency that prompted the *Zinermon* Court

---

7. In his statement of facts in his brief on appeal, Dr. Lowe offered the following interpretation of the phone call between Dr. Hamolsky and Leland Clabots: "Hamolsky did not qualify his response as being his personal opinion, nor did he characterize it as opinion, or as an untested and nonbinding interpretation of a subcommittee of the Board." In an accompanying footnote, Dr. Lowe added that "Hamolsky denied making the statement as Clabots testified. The jury was entitled to disbelieve Hamolsky: the hospital recorded Hamolsky's statement just two days later, reporting in a letter to Hamolsky that Hamolsky had informed Clabots 'that the Board's position was that Dr. Lowe is prohibited from supervision of nurse midwives at the Hospital.'" Brief for the Appellants at 16–17 & n. 9.

to reject the applicability of the *Parratt/Hudson* rule.

In this case, by contrast, the evidence showed that predeprivation process was expressly provided within the terms of the Consent Order itself, precisely for the purpose of assuring that any disputes over the level of restriction of Dr. Lowe's license would be resolved authoritatively by the Hearing Committee on behalf of the Board. The critical element of the *Zinermon* Court's analysis—the Court's sense that predeprivation safeguards might have had some value in guarding against the injury allegedly suffered by Burch—is not present in this case because the dispute resolution mechanism established by the Consent Order was as detailed a predeprivation safeguard as could have been provided.

Furthermore, unlike the hospital officials in *Zinermon*, there was no evidence that showed that Dr. Hamolsky's authority as Chief Administrative Officer of the Board "delegated to [him] the power and authority to effect the very deprivation complained of...." *Zinermon*, 494 U.S. at 138, 110 S.Ct. at 990. The evidence demonstrated that Dr. Hamolsky was authorized to notify all hospitals in Rhode Island of any disciplinary actions taken against a physician that was approved and agreed to by the Board. He was not, however, authorized to misrepresent the position of the Board. Unlike the hospital officials in *Zinermon*, whose authority was so broad and uncircumscribed that it allowed them at their discretion to admit patients on either an involuntary or voluntary basis, Dr. Hamolsky's authority as Chief Administrative Officer in no way extended to the right to determine the status of a physician's license independently of the Board. It was not within Dr. Hamolsky's discretion to decide whether to follow the procedural safeguards expressly contemplated under the Consent Order in the event of disputes over the status of Dr. Lowe's license. In this respect, we think that a deliberate misstatement of the Board's view of the status of Dr. Lowe's license is more closely analogous to the intentional, unauthorized conduct of the prison guards in *Hudson*

who destroyed a prisoner's property in the course of a search of his cell.

We conclude that the evidence established that the nature of Dr. Hamolsky's conduct placed Dr. Lowe's claim squarely within the rule of *Parratt* and *Hudson* that "postdeprivation tort remedies are all the process that is due [ ] simply because they are the only remedies the State could be expected to provide." *Zinermon*, 494 U.S. at 128, 110 S.Ct. at 985. We find nothing in the record that indicates that at any time during this case Dr. Lowe has challenged the adequacy of Rhode Island's remedies for the injuries alleged to have resulted to his practice. In fact, in this action Dr. Lowe *did* bring a claim against Dr. Hamolsky under Rhode Island common law for "tortious interference with his advantageous and/or contractual relations" with WIH, which the jury rejected and Dr. Lowe has not appealed. Thus, even if the evidence *was* sufficient to support a finding by the jury that Dr. Hamolsky's unauthorized conduct deprived Dr. Lowe of part of his property interest in his license, Dr. Lowe was nonetheless not entitled to a jury instruction on his § 1983 claim for damages against Dr. Hamolsky because such evidence does not support claim of a violation of Dr. Lowe's rights to procedural due process. There was, therefore, no error by the district court.

Because we affirm, albeit on other grounds, the district court's grant of a directed verdict on Dr. Lowe's claim of a deprivation of his property interest in his hospital privileges, as well as its refusal to instruct on Dr. Lowe's claim of a deprivation of his property interest in his medical license, we need not consider Dr. Lowe's appeal of the court's grant of a conditional new trial.

The judgment of the district court is AFFIRMED.