United States Court of Appeals
For the First Circuit

No. 92-1758

FOCUS INVESTMENT ASSOCIATES, INC.,

Plaintiff, Appellant,

v.

AMERICAN TITLE INSURANCE COMPANY, ET AL.,

Defendants, Appellees.

No. 92-1766

FOCUS INVESTMENT ASSOCIATES, INC.,

Plaintiff, Appellee,

v.

AMERICAN TITLE INSURANCE COMPANY, ET AL.,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, Senior U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

Steven E. Snow with whom Partridge, Snow & Hahn was on brief for

appellant/cross-appellee Focus Investment Associates, Inc.
Max Wistow with whom Stephen P. Sheehan and Wistow & Barylick

Inc. were on brief for appellee/cross-appellant American Title

Insurance Company.
William H. Jestings with whom Patricia A. Buckley and Carroll,

Kelly & Murphy were on brief for appellees Tobak and Abrams & Verri.

Robert S. Bruzzi was on brief for appellee Owen B. Landman.

May 11, 1993

STAHL, Circuit Judge. In these cross-appeals, we

explore, inter alia, the parameters of a title insurance

company's duty to disclose title defects to its insured, a

lender-mortgagee. The district court, finding that no such

duty existed, granted a post-judgment motion for judgment as

a matter of law in favor of defendant American Title

Insurance Co. ("American"), thus nullifying a jury verdict

awarding $286,000 in negligence damages to plaintiff Focus

Investment Associates, Inc. ("Focus").1 Focus appeals that

ruling, as well as others related to it. American,

meanwhile, argues that the jury's $49,000 damage award on

Focus's contract claim may have resulted from erroneous

instructions and should therefore be vacated. For the

reasons that follow, we affirm the judgments against Focus

and vacate the judgment against American.2

1. See generally Focus Inv. Assocs. v. American Title Ins.

Co., 797 F. Supp. 109 (D.R.I. 1992).

2. Prior to trial, Fed. R. Civ. P. Rule 50 had already been
amended to abolish the different designations between a pre-
judgment "motion for directed verdict" and a post-judgment
"motion for judgment n.o.v." Both motions are now known as
"motions for judgment as a matter of law." As the applicable
standards under the two denominations do not differ, we will,
for purposes of consistency, refer to the motions at issue as
though they were submitted and ruled upon under the amended
Rule. See Davet v. Maccarone, 973 F.2d 22, 26 n.4 (1st Cir.

1992) (discussing amendment to federal rule and substituting
appropriate nomenclature).

-3-
3

I.

Background Facts

Unless otherwise indicated, the following facts are

undisputed. Focus, a family-owned and operated Ohio

corporation, invests money from a family trust and makes

loans secured by interests in real estate. On December 6,

1988, Laurence J. Shapiro, a now-deceased Boston-based real

estate developer and mortgage broker, contacted Focus

President Edward Sarbey3 to solicit placement of a $250,000

short-term loan to George Marderosian, a Rhode Island

attorney. Shapiro explained that Marderosian was lead

attorney in a real estate enterprise, which urgently needed

to fund operational cash shortfalls. Shapiro indicated to

Focus that Guardian Mortgage Corp., a loan company Shapiro

operated, would make and close the loan, and then assign all

loan documents to Focus, in return for Focus's funding and

purchase of the loan.

Shapiro represented to Focus that the loan would be

fully secured by second mortgages on twelve condominium units

valued at $1.14 million, subject only to Attleboro Pawtucket

Savings Bank's ("Attleboro") first mortgage with an

3. Shapiro and Sarbey became acquainted when the two were
neighbors in Boston, prior to Sarbey's relocation to Ohio.
According to Sarbey, Shapiro originally recommended loans
secured by real estate as a safe and profitable investment
idea. Prior to the loan here at issue, Shapiro had arranged
several other loans for Focus.

-4-
4

approximate balance of $720,000. As additional security,

Focus was to be given a second mortgage on Marderosian's

home, which, according to Shapiro, had an equity value of

$100,000 to $150,000 over and above The Boston Five Corp.'s

first mortgage. Finally, Shapiro and Marderosian agreed to

personally guarantee the loan, and to assign to Focus the

proceeds of a consulting agreement between Shapiro and Dean

Street Development, a Marderosian client. Based on these

representations, Focus agreed to purchase and fund the loan.

Shapiro hired defendant James Tobak, an associate

of defendant law firm Abrams and Verri, to represent the

lender's interests4 and close the loan deal. On December 6,

1988, Tobak transmitted to Sarbey facsimiles of the

promissory notes, mortgages, and guarantees executed in

connection with the loan. The following day, Tobak informed

Sarbey that Focus's mortgages had been recorded and that

title insurance had been obtained. He then requested Sarbey

to wire the loan proceeds to Abrams and Verri's escrow

account, which Sarbey did the same day. The loan closing

took place December 8, 1988. The terms of the loan called

for an annual interest rate of 20 percent, with monthly

4. Focus claims that Tobak was hired to protect its
interests, while Tobak claims he was hired to protect
Shapiro's and Guardian's interests. We address this dispute-
-which turns on the identity of the actual "lender"--more
fully infra at 15.

-5-
5

interest payments of $4,166.67 to begin on January 6, 1989.

Final repayment was due on April 6, 1989.

Among the loan documents, Focus received two title

insurance policies issued by American's policy-issuing

attorney, defendant Owen Landman. The first policy insured

Focus's second mortgage on 12 condominium units. The policy

showed title to the units to be vested in the name of George

A. Marderosian, Trustee of the River's Edge Realty Trust.

Excepted from coverage under the first policy was a first

mortgage with a principal balance of $720,000. The second

policy insured Focus's second mortgage on Marderosian's home,

excepting a first mortgage in the principal amount of

$150,000.

Near the end of December 1988, Shapiro died. In

January, February and March 1989, Marderosian made payments

to Focus totalling $23,200. However, as of the April 6,

1988, due date, the balance of the principal and the interest

due under the terms of the promissory note remained unpaid.

In the course of considering its response to Marderosian's

non-payment, Focus discovered that its mortgages did not

occupy a second position on either of the collateral

properties. With respect to the condominium units, Focus's

mortgage was in fifth position. Focus's mortgage on

Marderosian's home was in fourth position, behind mortgages

held by C & K Investments ($100,000) and Bank of New England-

-6-
6

Old Colony ($50,000), as well as the first mortgage held by

Boston Five Corp. In addition, at the time Focus's mortgage

was recorded, title to the condominium units was vested in

Capital Center Development, not Marderosian. Neither of the

title insurance policies reflected the existence of the

senior mortgages nor did the condominium policy reflect the

actual ownership.

The title insurance policies in question were

issued by defendant Landman, whom American had appointed as a

policy-issuing attorney in April 1980. Landman, who shared

office space with Marderosian, was listed as "Of Counsel" on

the Marderosian law firm letterhead. Landman testified that

he issued the title policies at Marderosian's request. He

conducted no independent title search, but instead relied on

Marderosian's representations as to the ownership and

mortgage status of the collateral properties.

In July 1989, Attleboro foreclosed its mortgage on

the condominium units. The foreclosure sale price was

$220,000 less than the balance of Attleboro's mortgage,

leaving nothing for a second mortgagee. Shortly thereafter,

Marderosian's home was bid in at foreclosure by second

mortgagee C & K Investments, which assumed liability for the

principal balance of $150,000 remaining on Boston Five

Corp.'s first mortgage and paid an additional $49,000, for a

total purchase price of $199,000. Thus, $49,000 in proceeds

-7-
7

remained after satisfaction of the Boston Five Corp.

mortgage.

On November 11, 1989, Focus filed a diversity

action against American, Landman, Tobak, Abrams & Verri,

Shapiro's estate, and Marderosian. The nine-count complaint

sought damages from American for breach of the title

insurance contract, negligence in searching title, negligent

hiring, retention and supervision of Landman, negligent

misrepresentation of Focus's mortgage position, and bad faith

refusal to settle. Focus accused Landman of negligence in

searching title and negligent misrepresentation. Tobak and

Abrams & Verri were charged with negligent misrepresentation,

legal malpractice, breach of contract and breach of fiduciary

duty. Finally, Focus sought to enforce the personal

guaranties tendered by Shapiro and Marderosian. Prior to

trial, Marderosian filed a motion to dismiss, to which Focus

did not object, apparently because it thought Marderosian to

be judgment-free. The district court granted the motion,

with prejudice.

At trial, Focus argued that the terms of the title

insurance contract obligated American to pay Focus the

$49,000 that would have been available to Focus had it

actually been the second mortgage holder on Marderosian's

home. In addition, Focus sought to recover the loan

proceeds, plus costs and interest from defendants American,

-8-
8

Landman, Tobak, et al., theorizing that but for their

tortious conduct, Focus never would have made the loan to

Marderosian.

At the close of Focus's case-in-chief, American,

Landman, Tobak, and Abrams & Verri moved for judgment as a

matter of law. The court reserved decision on the motions.

The defendants renewed their motions at the close of all the

evidence. Focus also moved for judgment as a matter of law

on American's affirmative defense of usury. The court denied

Focus's motion and reserved decision on the motions of

American and Landman. The court granted the motions of Tobak

and Abrams & Verri, ruling that Focus's failure to present

expert testimony with respect to an attorney's standard of

care under the relevant circumstances was fatal to the claim

of legal malpractice.

The jury found American liable on both contract and

negligence grounds, awarding damages of $49,000 and $286,000,

respectively. The jury also found Landman negligent, but

awarded no damages. Following trial, American moved for

judgment as a matter of law on both the contract and

negligence counts. The district court, ruling that American

owed Focus no duty with respect to the title search, granted

the motion on the negligence count, while denying the motion

on the contract claim. On June 18, 1992, judgment was

entered in accordance with these rulings.

-9-
9

Both Focus and American appealed. Focus claims

that judgment as a matter of law was improper because

American was under a duty to Focus to perform a reasonable

title search. Focus also argues that the district court

incorrectly ruled that expert testimony was necessary on an

attorney's standard of care, and that even if such testimony

was required, it was supplied via the testimony of attorneys

Tobak and Marderosian. American appeals on the ground that

the district court incorrectly charged the jury that it "may"

return a verdict for American if it found the loan to

Marderosian usurious, when in actuality a finding of usury

would mean that a jury "must" rule in favor of American.5

II.

Focus's Appeal

A. Judgment as a Matter of Law

The bulk of Focus's appeal is aimed at the district

court's grant of judgment as a matter of law against Focus on

its various claims of negligence. In reviewing a grant of

judgment as a matter of law, the evidence and all reasonable

5. Focus also argued that American should be held
vicariously liable for the negligence of its alleged agent,
Landman. The district court ruled that Landman was not
American's agent, and Focus appeals that decision as well.
The only asserted basis for Landman's negligence was his
failure to independently search title prior to issuing the
policies in question. Because, as will be explained more
fully, infra, we find that a title insurer owes no duty to an

insured with respect to a title search, we need not resolve
the agency issue.

-10-
10

inferences therefrom must be examined in the light most

favorable to the nonmovant. Lowe v. Scott, 959 F.2d 323, 337

(1st Cir. 1992). Judgment as a matter of law is appropriate

only when the evidence, so viewed, is such that a reasonable

jury could reach only one conclusion. Id.

B. The Negligence Claims6

1. The Title Search

Focus essentially argues, as it did at trial, that

American--via its agent, Landman--failed to conduct a

reasonable title search prior to issuing the title insurance

policy to Focus. Had American done so, and thereafter

disclosed to Focus the correct number of superior mortgages

on the proffered collateral, Focus claims it never would have

made the loan to Marderosian. At the heart of this argument

is the question of whether a title insurance company can be

held liable for failure to search title and disclose title

defects to its insured. This is apparently an issue of first

6. We note that the jury was not given separate instructions
relative to each of Focus's negligence claims against
American--e.g., searching title, misrepresentation,
supervision, etc.--but instead was given a verdict form which
asked only, "Do you find American Title liable for negligence
in issuing the title insurance policies?" Therefore, because
the record does not indicate which theory the jury relied
upon to make its $286,000 negligence award, we, like the
district court, must examine each theory individually. See

Welsh Mfg., Div. Of Textron v. Pinkerton's, 474 A.2d 436,

441-42 (R.I. 1984) (when multiple theories of liability are
submitted to a jury, which then is asked to return a general
verdict, each theory must be tested separately to determine
whether submission to the jury is appropriate) (citing Davis

v. Caldwell, 429 N.E.2d 741, 742 (N.Y. 1981)).

-11-
11

impression in Rhode Island, and thus we will seek guidance

from, inter alia, analogous decisions of other jurisdictions.

See Sainz Gonzalez v. Banco de Santander-Puerto Rico, 932

F.2d 999, 1001 (1st Cir. 1991) ("A diversity court faced with

a paucity of apposite decisional law may look to `analogous

decisions . . . and any other reliable data tending to

convincingly show how the highest court in the relevant

jurisdiction would decide the issue.'")(quoting Redgrave v.

Boston Symphony Orchestra, Inc., 855 F.2d 888, 903 (1st Cir.

1988) (en banc)). We review de novo the district court's

state law determination. Salve Regina College v. Russell,

111 S. Ct. 1217, 1223-25 (1991).

It is true, as Focus asserts, that some courts have

concluded that a title insurance company may be liable in

tort if it negligently fails to discover and disclose a title

defect to its insured. See, e.g., Red Lobster Inns of

America v. Lawyers Title Ins. Corp., 656 F.2d 381, 383 (8th

Cir. 1981) (applying Arkansas law); Bank of California v.

First American Title Ins. Co., 826 P.2d 1126, 1128 (Alaska

1992); White v. Western Title Ins. Co., 710 P.2d 309, 315

(Cal. 1985); Ford v. Guarantee Abstract & Title Co., 553

P.2d 254, 266 (Kan. 1976); Heyd v. Chicago Title Ins. Co.,

354 N.W.2d 154, 158 (Neb. 1984). See generally Joyce Dickey

Palomar, Title Insurance Companies' Liability for Failure to

Search Title and Disclose Record Title, 20 Creighton L. Rev.

-12-
12

455 (1986-87). In each of those cases, however, the title

insurance company either had expressly agreed to provide a

title report or had issued to the insured a preliminary title

report which failed to disclose a title defect which was then

excluded from coverage under the policy. In such situations,

two distinct responsibilities are assumed [by
the insurer]; in rendering the first service,
the insurer serves as an abstractor of title
and must list all matters of public record
regarding the subject property in its
preliminary report. When a title insurer
breaches its duty to abstract title accurately
it may be held liable in tort for all damages
proximately caused by such breach.

Ford, 553 P.2d at 266 (citations omitted).

In the absence of an express contract or

preliminary title report, however, courts have uniformly

declined to hold a title insurance company liable for a

negligent title search. See, e.g., Brown's Tie & Lumber Co.

v. Chicago Title Co., 764 P.2d 423, 425-27 (Idaho 1988);

Roscoe v. United States Life Title Ins. Co., 734 P.2d 1272,

1274 (N.M. 1987); Grunberger v. Iseson, 429 N.Y.S.2d 209,

210-11 (N.Y. App. Div. 1980); Greenberg v. Stewart Title

Guar. Co., 492 N.W.2d 147 (Wis. 1992); see also Walker Rogge,

Inc. v. Chelsea Title and Guar. Co., 562 A.2d 208, 217-19

(N.J. 1989) (collecting cases).

Here, American neither contracted to provide Focus

with a title report, nor provided Focus with a preliminary

title report. Thus, we agree with the district court that in

-13-
13

trying to recover its loan loss under negligence principles,

Focus seeks to expand its relationship with American beyond

the bounds of the title insurance policy and thereby impose

upon American a duty neither undertaken nor imposed by law.7

7. The cover sheet of the policies here at issue states
that:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE,
THE EXCEPTIONS CONTAINED IN SCHEDULE B
AND THE PROVISIONS OF THE CONDITIONS AND
STIPULATIONS HEREOF, AMERICAN TITLE
INSURANCE COMPANY . . . insures . . .
against loss or damage, not exceeding the
amount of insurance stated in Schedule A
. . . sustained or incurred by the
insured by reason of:

1. Title to the estate or interest
described in Schedule A being vested
otherwise than as stated therein;

2. Any defect in or lien or encumbrance
on such title;

. . . .

6. The priority of any lien or
encumbrance over the lien of the insured
mortgage;

. . . .

Among the relevant Conditions and Stipulations are the
following:

6. DETERMINATION AND PAYMENT OF LOSS
(a) The liability of [American]
under this policy shall in no case exceed
the least of:
(i) the actual loss of the insured
claimant; or
(ii) the amount of insurance stated
in Schedule A . . . .

. . . .

-14-
14

See Horn v. Lawyers Title Ins. Co., 557 P.2d 206, 208 (N.M.

1976) ("The rights and duties of the parties are fixed by the

contract of title insurance.").8 In the absence of a duty

to search title, as a matter of law, there can be no

liability for failing to do so. See Banks v. Bowen's Landing

Corp., 522 A.2d 1222, 1224-25 (R.I. 1987) (if no duty runs

from defendant to plaintiff, an issue which is to be decided

by the court, the trier of fact has nothing to consider and

judgment as a matter of law must be entered).9 Accordingly,

we find that the district court correctly granted judgment as

11. LIABILITY LIMITED TO THIS POLICY
This instrument together with all
endorsements and other instruments, if
any, attached hereto by [American] is the
entire policy and contract between the
insured and [American].
Any claim of loss or damage, whether
or not based on negligence, and which
arises out of the status of the lien of
the insured mortgage or of the title to
the estate or interest covered hereby or
any action asserting such claim, shall be
restricted to the provisions and
conditions and stipulations of this
policy.

8. To the extent that a title insurer searches title prior
to issuing a policy, it does so only for its own benefit, to
ascertain its risk of liability under the policy as it will
except from coverage any title defect it does discover and be
liable for damages caused by undiscovered--and unexcepted--
defects. See Greenberg, 492 N.W.2d at 150.

9. To the extent, therefore, that Focus claims that the
existence of a duty was a question for the jury, such an
argument is legally incorrect. Banks, 522 A.2d at 1225.

-15-
15

a matter of law on Focus's claim of negligence in searching

title.

2. Negligent Misrepresentation

As we have said, each of the title insurance

policies here at issue excepted from coverage only one prior

mortgage, thereby insuring Focus's position as second

mortgagee on both the condominium units and Marderosian

residence. Focus argues that the policies therefore amounted

to a false representation that its mortgages were in second

position, which representation was due to American's

negligence. Consequently, Focus argues, because it relied on

these representations in deciding to make the loan to

Marderosian, American is liable for Marderosian's default.

Although we agree with the district court that American, as a

matter of law, was not liable to Focus for negligent

misrepresentation, our reasoning differs somewhat from that

of the district court. See Banco Popular de Puerto Rico v.

Greenblatt, 964 F.2d 1227, 1230 (1st Cir. 1992) (appellate

court can affirm a judgment on any independently sufficient

ground reflected in the record).

We have stated that "[t]itle insurance is a

contract of indemnity, not guarantee." Falmouth Nat. Bank v.

Ticor Title Ins. Co., 920 F.2d 1058, 1062 (1st Cir. 1990)

(applying Massachusetts law) (citations omitted). Therefore,

by issuing a policy, "an insurer does not guarantee the state

-16-
16

of the title, but rather, agrees to indemnify the insured for

any loss." Id. "Put another way, it is not the mortgage note

that is insured, but rather, what is insured is the loss

resulting from a defect in the security." Id. (citing

Southwest Title Ins. Co. v. Northland Bldg. Corp., 552 S.W.2d

425, 430 (Tex. 1977)). Moreover, a title insurer "does not

guarantee either that the mortgaged premises are worth the

amount of the mortgage or that the mortgage debt will be

repaid." Blackhawk Prod. Credit Assoc. v. Chicago Title Ins.

Co., 423 N.W.2d 521, 525 (Wis. 1988) (citations omitted). As

the title insurance policies issued by American were not

representations of title, they cannot, as a matter of law,

form the basis of a claim of negligent misrepresentation.10

10. Not only are the district court's decisions regarding
the title insurance policies in accord with those of other
jurisdictions, they are supported by logic as well. In our
view, Focus's position is tantamount to a buyer of life
insurance claiming that his policy is a guarantee against
death. Focus's claim that it relied on the insurance
policies as evidence that no undisclosed superior liens
existed simply flies in the face of the fact that the
policies were issued to protect Focus against losses it may
suffer from undisclosed superior liens. Moreover, an
insured's losses are limited to situations where the security
of the insured lien is actually impaired by the undisclosed
superior lien. "The mere fact of an undisclosed prior lien
is insufficient to establish this claim; a showing that the
prior lien renders the insured lien `insecure' must be made
as well." Blackhawk, 423 N.W.2d at 525-26. (citation

omitted). In other words, if the lien held by Focus would
have been valueless without the undisclosed lien, Focus
cannot claim any loss due to the presence of the undisclosed
lien. This explains the jury's $49,000 award under the
contract, because between the two collateral properties, only
that amount--left over from the foreclosure sale of the
Marderosian residence--would have been available to Focus as

-17-
17

3. Negligent Hiring, Retention and Supervision

In addition to claims of negligence in searching title

and negligent misrepresentation, Focus asserted at trial

claims directly against American for negligent hiring,

retention and supervision of its policy-issuing attorneys,

Landman and Marderosian. The district court found none of

these theories to be legally supportable. We agree.

Rhode Island law does recognize the direct

liability of an employer to third parties for damages caused

by employees or agents who were negligently hired, trained or

supervised. Welsh Mfg., 474 A.2d at 438. This liability is

based on a failure to exercise reasonable care in hiring and

retaining a person who the employer knows or should know is

unfit for the job, and who therefore exposes third parties to

unreasonable risks of harm. Id. at 440. With respect to

American's selection and retention of Landman as a policy-

a second mortgagee. With respect to the rest of the loan to
Marderosian, Focus was simply insufficiently collateralized.
In making this last statement, we reject Focus's claim that
American's negligence resulted in a confused state of title
that "chilled" the foreclosure sales and thereby reduced the
equity available to a second mortgagee. Although Focus
presented expert evidence at trial indicating that the
collateral properties had a market value exceeding the
foreclosure sale price, those experts testified that although
foreclosure itself would reduce a property's market value,
they did not consider the effects of a foreclosure sale on
the value of the property at issue in arriving at their
appraisal. Finally, there was no explanation of how
American's alleged negligence--as opposed to Marderosian's
actions--created the title confusion, the foreclosure
situation or the resulting depressed value.

-18-
18

issuing attorney, however, the record is devoid of evidence

that American knew or should have known that Landman was

unfit for the position. Nor was any evidence presented that

Landman exhibited any job-related deficiencies during the

nine-year period he served American. Accordingly, we find

Focus's negligent hiring and retention claims to be legally

insufficient.

Focus next argues that American's failure to give

Landman personal instructions or training with respect to

title insurance or title searching, failure to conduct

seminars or courses, and failure to audit Landman's work

constituted negligence and resulted in Focus's loss on the

Marderosian loan. As we have stated already, however,

American was under no duty to provide Focus with a title

report, and any title search undertaken by Landman or

American was for American's benefit, not Focus's. Thus, any

failure on American's part to train Landman is not actionable

by Focus.

Finally, to support its claim of negligent

supervision, Focus argues that if American had a system

whereby it could have ascertained which property interests it

already insured, it would have discovered the senior liens

not disclosed on the policies issued to Focus, since earlier

policies on the same properties showed additional different

encumbrances. Focus's argument fails, however, because, as

-19-
19

American correctly points out, title policies issued at

different times may show different encumbrances on the same

property simply because the encumbrances may have changed

over time due to refinancing or discharge. Therefore, Focus

has failed to indicate how such a cross-checking system would

have yielded any relevant information.

In the end, with respect to all of Focus's

negligence claims, Focus received what it bargained for -- a

title insurance policy which promised to indemnify Focus for

any losses suffered as a result of Focus not having a second

mortgage on the relevant collateral properties. As the only

equity available to a second mortgagee was $49,000 from the

foreclosure of the Marderosian residence, that was the

"actual loss" within the meaning of the policy, see supra

note 7, and thus the only loss American was required to

indemnify. Focus was not legally entitled to anything else

from American.

C. Legal Malpractice

The district court granted judgment as a matter of

law in favor of Tobak and Abrams & Verri, holding that Focus

needed to present expert testimony to the jury with respect

to the duty of care owed by an attorney in Tobak's position.

Focus first argues that no such expert testimony was required

because the standard of care of an attorney "in representing

a lender" is within a layman's common knowledge. In the

-20-
20

alternative, Focus argues that the jury was presented with

such evidence via the testimony or cross-examination of

Tobak, Landman and Marderosian. After careful analysis, we

are unpersuaded by Focus's contentions.

As an initial matter, we note that in arguing that

no expert testimony was required relative to the duty owed by

a lender's attorney, Focus has, in our view, misapprehended a

critical concern of the district court. In granting Tobak's

motion, the court emphasized the confusion surrounding

Tobak's actual role in the loan process, and found that

Focus's failure to present evidence which would have clearly

established Tobak's role was a serious matter, as was its

failure to present evidence indicating exactly what is the

standard of care for an attorney performing that role.11

11. Specifically, the district court stated:

My understanding is that the argument is
that Mr. Tobac (sic) allegedly gave an
opinion upon which the Plaintiff relied
that each of the mortgages in question
were second mortgages. There is an
underlying factual issue here of whether
or not in the first place the defendant,
Tobac (sic), and his law firm were
engaged for the purpose of providing an
opinion with respect to the effect of the
two mortgages. I'm satisfied . . . that
this is a circumstance in which it's
necessary to have available to the jury
expert opinion with respect to the duty
of an attorney in Mr. Tobac's (sic)
situation. Particularly in light of the
fact that his situation is unclear to
begin with as to just exactly what he was
hired to do. What his engagement was.

-21-
21

1. The Need for Expert Testimony

It is well settled under Rhode Island law that a

legal malpractice plaintiff must prove the "want of ordinary

care and skill" by the defendant. Holmes v. Peck, 1 R.I.

242, 245 (1849). While there is no Rhode Island case law

addressing the issue of expert testimony in a legal

malpractice case, a review of other jurisdictions indicates

that the most widely accepted rule is that a legal

malpractice plaintiff must present expert testimony

establishing the appropriate standard of care unless the

attorney's lack of care and skill is so obvious that the

trier of fact can resolve the issue as a matter of common

knowledge. See generally, Michael A. DiSabatino, Annotation,

Admissibility and Necessity of Expert Evidence as to

Standards of Practice and Negligence in Malpractice Action

Against Attorney, 14 A.L.R. 4th 170 (1982) (and cases cited

therein). Cases which fall into the "common knowledge"

category are those where the negligence is "clear and

palpable," or where no analysis of legal expertise is

involved. See e.g., Collins v. Greenstein, 595 P.2d 275

(Haw. 1979) (no expert testimony required for jury to

evaluate attorney's failure to file suit within applicable

limitations period); Suritz v. Kelner, 155 So. 2d 831 (Fla.

Dist. Ct. App. 1963) (no expert testimony required where

attorney directed clients not to answer interrogatories even

-22-
22

though judge had directed clients to answer on penalty of

dismissal), cert. denied, 165 So. 2d 178 (Fla. 1964); Olfe v.

Gordon, 286 N.W.2d 573 (Wis. 1980) (no expert testimony

required where attorney failed to follow client's

instructions because claim was not based on exercise of legal

expertise).

On the other hand, in cases where legal expertise

is an issue, "a jury cannot rationally apply negligence

principles to professional conduct absent evidence of what

the competent lawyer would have done under similar

circumstances . . . " Lenius v. King, 294 N.W.2d 912, 914

(S.D. 1980). See also, Lentino v. Fringe Employee Plans,

Inc., 611 F.2d 474 (3d Cir. 1979) (where attorney was accused

of malpractice for failing to properly advise a pension fund

on the tax consequences of a pension plan amendment, expert

testimony would be required due to the necessary analysis of

the tax code, regulations, and revenue rulings) (applying

Pennsylvania law); Willage v. Law Offices of Wallace &

Breslow, P.A., 415 So. 2d 767 (Fla. Dist. Ct. App. 1982)

(expert testimony required where malpractice case was based

on attorney's failure to call a particular witness, when

attorney feared damaging cross-examination of witness).

Here, Tobak testified that he was hired by Shapiro

and Guardian, together referred to as "the lender," to review

loan documents, and in order to do so, he relied on

-23-
23

information provided to him by his client. He testified that

nothing he reviewed indicated to him that the loan was not

proceeding as planned. Sarbey also testified that it was his

understanding that Tobak was representing "the lender," but

because, in his opinion, Focus was the lender, Sarbey thought

that Tobak was representing Focus. Essentially, Focus argues

that Tobak was employed by Focus and committed malpractice by

relying on the documentation he was presented and simply

reviewing it without making an independent investigation. In

our view, regardless of who Tobak represented, Focus's claim

clearly implicates the issue of Tobak's application of his

legal expertise to the situation. Accord, Fall River Sav.

Bank v. Callahan, 463 N.E.2d 555 (Mass. App. Ct. 1984)

(approving trial court's use of supplemental sources to

augment expert testimony in malpractice trial of title

attorney). Accordingly, we find that the district court

decided correctly that expert testimony was required to

establish the standard of care applicable to an attorney in

Tobak's position.

2. Trial Testimony as Expert Testimony
2. Trial Testimony as Expert Testimony

On appeal, Focus asserts that it "adduced the

requisite standards of care of a closing attorney, a title

attorney, a settlement agent and a fiduciary through the

testimony of James Tobak, Owen Landman and George

Marderosian." This argument misses the point, and serves to

-24-
24

highlight the controversy surrounding Tobak, for Focus has

again, as it did before the district court, failed to

indicate which role Tobak occupied. Thus, even assuming that

the testimony of the three defendants did adduce the claimed

standards, the jury could only speculate as to which standard

applied to Tobak. See Lenius, 294 N.W.2d at 914 (jury may not

be permitted to speculate as to standard of professional

conduct). Given the parties' dispute over the employment

issue, we believe that the district court correctly concluded

that the jury should have been presented with testimony

concerning the role assumed by--and concomitant duties of--an

attorney in Tobak's position; that is, hired by a party who,

on paper, is the lender, but in reality is a broker through

whom the loan proceeds will pass. Because Focus failed to

clear that hurdle, we need not address the adequacy of the

testimony that was introduced at trial. Instead, given the

factual and legal landscape, we find that the district court

correctly concluded that expert testimony on the nature of

Tobak's role was both required and lacking, and therefore

properly granted judgment as a matter of law in favor of

Tobak and Abrams & Verri.12

12. Focus argues for the first time on appeal that the
district court erred because if the jury had found for
American on its usury claim, then Tobak would have been
liable to Focus for failing to apprise Focus of the
illegality. We do not reach this issue, but instead
reiterate our familiar position that arguments not raised
before the district court "cannot be surfaced for the first

-25-
25

III.

American's Appeal

A. Usury

Under Rhode Island law, loans which call for annual

interest payments in excess of 21 percent are considered

usurious, and are therefore void and uncollectible. R.I.

Gen. Laws 6-26-2, 6-26-4 (1956) (1992 Reenactment);

DeFusco v. Giorgio, 440 A.2d 727, 731-32 (R.I. 1982). The

result is the same whether or not the lender intended to make

a usurious loan. In re Swartz, 37 B.R. 776 (Bankr. R.I.

1984). Here, there is no dispute that the promissory note

given to Guardian by Marderosian and assigned to Focus

provided for 20 percent annual interest. American claims,

however, that Shapiro's assignment to Focus of a $56,500

consulting fee paid to Shapiro by Marderosian's client Dean

Street Development--an assignment which occurred

contemporaneously with the Marderosian loan agreement--

constituted a separate, hidden interest payment on the

Marderosian loan, bringing the actual annual interest rate on

the loan to 88 percent.

According to American's theory, as a result of the

usurious--and therefore void--mortgage, Focus failed to

acquire an insurable property interest and therefore suffered

time on appeal." Goldman v. First National Bank of Boston,

No. 92-1773, slip op. at 5, n.4 (Feb. 18, 1993).

-26-
26

no damage as a result of any title defects. The district

court denied Focus's motion for judgment as a matter of law

with respect to usury, and allowed the issue to go to the

jury, giving the following instruction in the context of the

contract claim:

Defendant contends that payments
under a consulting agreement executed at
the same time as the loan agreement were
in reality interest payments on the loan.
If you find by a preponderance of the
evidence that the consulting agreement
was really a pretext for the payment of
an illegal rate of interest, then you may

find that the loan was unlawful and
return a verdict for Defendant on the
contract claim.

(Emphasis added). American timely objected, arguing that the

use of the word "may" impermissibly gave the jury discretion

to find for Focus even if it found the loan to be usurious.

The court did not change the instruction, and the jury

awarded Focus $49,000 under the title insurance policy

covering the mortgage on Marderosian's home. On appeal,

American claims that the "may" instruction was clear and

harmful error entitling it to a new trial. After careful

review, we agree.

Interestingly, Focus does not directly dispute the

central thesis of American's appeal--the failure of the jury

instruction to conform to the law of usury as it relates to

insurable interests. Instead, Focus argues that (1)

American, or anyone else other than the borrower, lacks

-27-
27

standing to raise the usury defense; (2) American failed to

establish a prima facie case of usury; and, (3) it is

"obvious" that the jury found that the loan was not usurious,

therefore rendering any error harmless. Finding all of

Focus's arguments unpersuasive, we address each in turn.

1. Standing

It is ordinarily true, as Focus asserts, that the

defense of usury is personal to the borrower or one in

privity with the borrower, and unavailable to strangers to

the usurious transaction. See generally, 45 Am. Jur. 2d

Interest and Usury 288 (1969) (and cases cited therein).

This custom allows a debtor who does not wish to invoke the

protections of usury laws to pay off the debt to which he

agreed. See DeFusco, 440 A.2d at 732 (although Rhode Island

usury laws manifest strong public policy against usurious

transactions, "we do not believe that the Legislature

intended thereby to preclude a debtor from waiving a defense

of usury under all circumstances"). Focus relies on a host of

cases, all of which restate the general proposition stated

above. E.g., Securities Exch. Comm'n v. First Sec. Co. of

Chicago, 366 F. Supp. 367, 373 (N.D. Ill. 1973); Iamartino v.

Avallone, 477 A.2d 124, 128 (Conn. App. Ct. 1984); General

Electric Credit Corp. v. Best Refrigerated Express, Inc., 385

N.W.2d 81, 83 (Neb. 1986); Pinnix v. Maryland Casualty Co.,

200 S.E. 874, 879 (N.C. 1939); Benser v. Independent Banks,

-28-
28

735 S.W.2d 566, 569 (Tex. 1987). In each of these cases,

however, the party asserting the usury claim was attempting

to avoid repayment of a debt, and was prohibited from

interposing the claim. See, e.g., Pinnix, 200 S.E. at 879

("to allow a stranger to interpose the defense of usury to a

contract with which the maker is in all respects satisfied,

and by the terms of which he desires to abide, and upon which

he is liable for a deficiency judgment, would be exceedingly

unfair to a debtor who desires to perform his contract. . .

."). Unlike the usury theorists in those cases, however,

American is not attempting to step into the shoes of the

borrower, Marderosian, and void the loan. Rather than

asserting usury as a defense to repayment of the loan,

American instead argues that the usurious nature of the

Marderosian loan rendered Focus's mortgage interest

uninsurable. Indeed, there appears to be no dispute that had

Focus not acquiesced to Marderosian's motion to dismiss,

Marderosian would have had the right to interpose a usury

defense. Thus, while American's claim does implicate the

question of usury, Focus's "personal defense" theory--while

accurate--is, in our view, misplaced. Accordingly, we turn

to the substance of American's argument.

"In order for recovery [on an insurance policy] to

be had, it is essential that the claimant show both an

existing contract of insurance and an insurable interest in

-29-
29

the property. No insurable interest existing, the contract

is considered absolutely void . . . " 4 John A. Appleman and

Jean Appleman, Insurance Law and Practice, 2121 (1969)

(footnotes omitted); Cronin v. Vermont Life Ins. Co., 40 A.

497 (R.I. 1898). In what is apparently the only case to

address the issue, the Minnesota Supreme Court held that a

usurious mortgage cannot give rise to an insurable interest.

Phalen Park State Bank v. Reeves, 251 N.W.2d 135, 138-39

(Minn. 1977). Phalen was a mortgagee's suit on a fire

insurance policy. The court accepted the insurance company's

argument that the bank, by charging interest on an

undisbursed portion of the loan, effectively charged a

usurious rate of interest. The Phalen court used two

separate analytical paths to reach its conclusion, both of

which are applicable here and inevitably lead us to the same

determination.

First, Phalen restated the general rule that one

has an insurable interest in property "by the existence of

which he will gain advantage, or by the destruction of which

he will suffer a loss." Id. at 139 (quoting Harrison v.

Fortlage, 161 U.S. 57, 65 (1896)); see also Appleman, supra,

2123, 2188. Because, however, a usurious mortgage is

void, and the mortgagee, therefore, has no right to collect

principal or interest, no loss will occur if the property is

destroyed. Id. The second rationale employed by

-30-
30

Phalen follows from the premise that where a state views a

particular legal scheme as reflecting the highest concern for

public welfare, strict adherence to that scheme applies, even

in collateral matters. Thus, given that the Minnesota

Legislature declared usurious transactions to be void, an

obvious expression of high public welfare concern, Phalen

held that no insurable interest could arise from a usurious

mortgage. Id. The Phalen court relied in part on Mackie &

Williams Food Stores, Inc. v. Anchor Casualty Co., 216 F.2d

317 (8th Cir. 1954), a case in which an automobile purchaser

failed to comply with statutory conveyancing requirements.

Where Missouri's transfer documentation requirement was found

to reflect public welfare concern in preventing transfers of

stolen automobiles, the court held that the purchaser did not

obtain an insurable interest. Id. See also, Cherokee

Foundries, Inc. v. Imperial Assurance Co., 219 S.W.2d 203

(Tenn. 1949) (purchaser of real property pursuant to an oral

sales contract did not acquire insurable interest because

contract was unenforceable under the statute of frauds).

Here, under either approach, a finding of usury in

the Marderosian-Focus transaction would lead to the

inexorable conclusion that the mortgages received by Focus as

collateral were not insurable interests. As to the first

theory, as we have already noted, usurious transactions are

void under Rhode Island law. Thus, if the loan is indeed

-31-
31

usurious, Marderosian could legally avoid repayment, and

recoup any sums already paid. Cf. Keenan v. Coppa, 195 A.

485 (R.I. 1937). Therefore, because a usurious loan would

leave Focus with no enforceable right in the mortgages at

issue, a jury finding of usury would necessarily leave Focus

with no insurable interest.

As to Phalen's second path, the Rhode Island

Supreme Court has unequivocally acknowledged that state's

strong public policy against usurious transactions. See

DeFusco, 440 A.2d at 732. Therefore, if Focus's mortgages

were acquired through a usurious transaction, violative of a

strong public policy, that public policy would apply to other

matters. Under those circumstances, Focus would have no

insurable interest. Accord Bankers & Shippers Ins. Co. v.

Blackwell, 51 So. 2d 498 (Ala. 1951) (trucking company held

to have no insurable interest in freight where carriage

contract was illegal). See also, Mackie & Williams, 216 F.2d

at 320; Cherokee Foundries, 219 S.W.2d at 206. Focus

counters by arguing that Phalen is, by its own terms, limited

to its facts, and that a later Minnesota case both

distinguished and minimized the importance of Phalen. See

Midwest Fed. Sav. and Loan Ass'n v. West Bend Mut. Ins. Co.,

407 N.W.2d 690 (Minn. Ct. App. 1987). We are unpersuaded.

It is true, as Focus points out, that the Phalen

majority concluded its opinion by stating: "[W]e stress that

-32-
32

our holding has resulted from and is limited to the unique

facts and circumstances presented in this case. We do not

intend by this decision to depart from the general rule in

this state that the defense of usury is personal to the

borrower." Id. at 141. Nowhere, however, does Phalen

indicate what "unique facts and circumstances" were

presented. Irrespective of this qualifying language,

however, Phalen's holding remains inescapable--that no

insurable interest can arise out of a usurious mortgage.

Moreover, as we previously noted, the "general rule"

regarding usury is inapposite to this case, where American is

not asserting a usury defense, as such. Finally, even if we

were to accept Focus's argument concerning Phalen's

limitations, we note that Phalen's conclusion with respect to

usury was but a small part of a broader inquiry; i.e.,

whether an insurable interest can arise out of a void or

unenforceable contract. The answer generally appears to be

negative. See supra pp. 27-29. Nor does Midwest help

Focus's cause. In Midwest, the court precluded an insurance

company from asserting a usury defense in an action by a

mortgagee seeking recovery under a fire policy. Although the

court cited Phalen for the "general rule" regarding the

personal nature of the usury defense, Id. at 695, the court's

decision--and that of the trial court, see id. at 695--was

based on a Minnesota statute which precluded all corporations

-33-
33

from invoking a usury defense. Id. Notably, the "insurable

interest" aspect of Phalen was never addressed in Midwest,

much less limited or distinguished. Finally, to the extent

that Midwest can be construed to run counter to Phalen, the

latter remains the pronouncement of Minnesota's highest

court. Based on the foregoing, we find that American could,

under these circumstances, properly raise its usury argument.

2. Prima Facie Case

To support its claim of usury, American argues that

Shapiro's assignment of rights under a consulting agreement

with Dean Street Development constituted hidden, additional

interest, apart from the 20 percent rate charged in the

Marderosian loan documents. Under American's theory, the

actual interest rate was 88 percent. Focus responds by

relying on the apparent separateness between Marderosian and

the parties to the consulting fee. Implicitly, the district

court rejected Focus's prima facie argument, as it denied its

motion for directed verdict on the usury issue. We reject it

as well. In short, Focus's argument ignores authority

holding that

"[u]sury is not determined merely from
what the parties represent the
transaction to be, but the court will
look to the whole transaction, the
surrounding circumstances, the
occurrences at the time of making the
agreement, and the instruments drawn.
Whether a transaction legal on its face
is, in fact, merely a device to cover

-34-
34

usury generally is a question of fact for
the jury."

45 Am. Jur. 2d Interest and Usury 112 (1969) (and cases

cited therein) (footnotes omitted).

Here, there is evidence that the loan proceeds were

intended for Dean Street Development, a Marderosian client in

need of "discreet" funding and there is no question that the

assignment from Shapiro to Focus was finalized at the same

time as the loan from Focus to Marderosian. Finally, the sum

payable under the assignment were due to be repaid April 6,

1989, the same day as the loan. Focus argues that the loan

and assignment were entirely separate transactions,

characterizing the assignment as nothing more than Shapiro

sharing his broker's commission with Focus, a non-usurious

transaction. While the jury, of course, is entirely free to

accept either version of the facts, it is quite clear that

American has at least made out a prima facie case of usury.

3. The Instruction

As the above discussion makes clear, if, in fact,

the jury were to find the loan to Marderosian usurious, then,

as a matter of law, Focus would have no insurable interest in

the collateral mortgages. Therefore, the instruction, which

used the permissive "may," allowed for both a finding of

usury and a verdict for Focus on its contract claim. This

-35-
35

was error.13 Accordingly, American is entitled to a new

trial on Focus's contract claim, accompanied by the

appropriate instruction on usury.

IV.

Conclusion

For the reasons stated herein, the judgment below

is vacated insofar as it awarded damages to Focus on its
vacated

contract claim, and affirmed in all other respects.
affirmed

13. We find nothing in the record to support Focus's bald
assertion that the error was harmless because "it is obvious
that the jury found that the loan was not usurious."

-36-
36